# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Henry Jenkins,**
**Petitioner Below, Petitioner**

**FILED**

**April 12, 2016**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

vs) **No. 15-0454** (Fayette County 12-C-283)

**David Ballard, Warden, Mount Olive Correctional Complex,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Henry Jenkins, by counsel Lori M. Waller, appeals the Circuit Court of Fayette County's February 9, 2015, order denying his petition for writ of habeas corpus. Respondent David Ballard, Warden, by counsel Jonathan E. Porter, filed a response. Petitioner filed a reply. On appeal, petitioner argues that the circuit court erred in denying his habeas petition on the ground of ineffective assistance of counsel.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was convicted of felony murder and child neglect resulting in death following a three-day jury trial in 2010. The circuit court sentenced petitioner to a term of imprisonment of life with mercy for felony murder and a consecutive term of incarceration of three to fifteen years for child neglect resulting in death. In 2011, petitioner filed a direct appeal with this Court arguing that his convictions violated the prohibition against double jeopardy, the State presented insufficient evidence to sustain a conviction for felony murder, and improper jury instructions. Petitioner also argued that the circuit court's decision to suppress his statement only during the State's case-in-chief was erroneous and that the circuit court erroneously permitted the admission of gruesome photographs and character evidence pursuant to Rule 404(b) of the West Virginia Rules of Evidence. By decision dated June 21, 2012, this Court affirmed petitioner's convictions. *See State v. Jenkins,* 229 W.Va. 415, 729 S.E.2d 250 (2012).

In August of 2014, petitioner, pro se, filed a petition for writ of habeas corpus relief in the circuit court. Thereafter, petitioner filed an amended petition for writ of habeas corpus relief, with the advice of counsel, alleging numerous grounds for relief, including multiple allegations that he received ineffective assistance of trial counsel. After two omnibus evidentiary hearings, the circuit court denied petitioner post-conviction habeas corpus relief by order entered February 9, 2015. It is from this order that petitioner appeals.

1

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner reasserts the same claims that were rejected by the circuit court. Petitioner reasserts that his trial counsel was ineffective for failing to 1) subpoena a witness to authenticate medical records to show that he attended the victim's regular doctor appointments; 2) subpoena or call a medical expert to testify what effect the victim's underlying medical conditions contributed to his death; 3) call character witnesses on his behalf; 4) object to inappropriate or prejudicial statements by the prosecutor; 5) make continuous objections throughout the trial and seek appropriate curative instructions; and 6) file a motion for change of venue due to pretrial publicity. Petitioner also reasserts that his trial counsel was ineffective for admitting an element of a crime. He again argues that all of these errors constitute cumulative error warranting reversal of the circuit court's order.

Upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's ninety-four page order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's February 9, 2015, "Order Denying and Dismissing Petition" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED: April 12, 2016**

**CONCURRED IN BY:**

Chief Justice Menis E. Ketchum
Justice Robin Jean Davis

Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Allen H. Loughry II

## IN THE CIRCUIT COURT OF FAYETTE COUNTY, WEST VIRGINIA

HENRY C. JENKINS,                      Petitioner,

v.                               Case No. 12-C-283
                                  Paul M. Blake, Jr., Judge

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,                  Respondent.

_____

## ORDER
## DENYING AND DISMISSING PETITION

_____

This matter is before the Court on a *Petition for Writ of Habeas Corpus Ad Subjiciendum* originally filed by *Petitioner*, Henry C. Jenkins, *pro se,* on August 30, 2012 ("*Original Petition*"). On February 14, 2014, the Petitioner, by and through counsel, Thomas K. Fast, Esq., filed an *Amended Petition For A Writ Of Habeas Corpus Ad-Subjiciendum*. This Court conducted an omnibus evidentiary hearing on May 5, 2014. The Court conducted a second evidentiary hearing on May 14, 2014. Following the latter evidentiary hearing, both parties were ordered to submit proposed findings of fact and conclusions of law to the Court for its review. The Court has since received said proposed findings of fact and conclusions of law from both the Petitioner and Respondent.

The Court has carefully reviewed the relevant portions of the record, the filings in this matter, and the relevant legal authority and has carefully considered the parties' arguments and the evidence presented at the evidentiary habeas corpus hearings. Based upon the following findings of fact and conclusions of law, the Court is of the opinion that the *Petition for Writ of Habeas Corpus Ad Subjiciendum* should be, and hereby is, **DENIED** and **DISMISSED**, with

-1-

prejudice, and enters this comprehensive *Order Denying And Dismissing Petition* pursuant to Section 53-4A-7(c) of the *West Virginia Code* and Rule 9(c) of the *West Virginia Rules Governing Post-Conviction Habeas Corpus Proceedings*.

## STATEMENT OF THE CASE

On November 14, 2009, Petitioner's fourteen (14) year old son, C.C.J.[1], suffered cardiac arrest at the Petitioner's home and collapsed into a vegetative state. C.C.J. had struggled with cystic fibrosis throughout his life. On November 19, 2008, C.C.J. died at Women and Children's Hospital in Charleston, West Virginia. At the time of his death, C.C.J. resided in Fayette County, West Virginia, with his father, the Petitioner. The child's mother, Naomi Griffith, was incarcerated at Lakin Correctional Facility at the time of death. Both the Petitioner and Ms. Griffith had been frequent abusers of pain medications throughout C.C.J's life.

While C.C.J. was at Women and Children's Hospital prior to his death, Fayette County Sheriff's Detective Jim Sizemore received a referral from CPS regarding his condition and began an investigation into the circumstances of his collapse.

Following a post-mortem autopsy performed by Dr. Zia Sabet of the West Virginia Medical Examiner's office, the initial cause of C.C.J.'s death was reflected on the death certificate as "hypoxic encephalopathy due to broncho-pneumonia and cystic fibrosis" and diabetes mellitus, Type I, was listed as another significant condition. The death was initially classified as "natural" on the death certificate.

The official toxicology report issued by Dr. James Kraner, Chief Toxicologist of the State Medical Examiner's Office, on January 21, 2014, stated that analysis conducted on the blood

---

[1] Consistent with the West Virginia Supreme Court of Appeals' customary practice, this Court will refer to the minor by his initials rather than by his full name. *See, e.g.*, In re Emily, 208 W. Va. 325, 540 S.E.2d 542 (2000).

-2-

samples that were first taken at the hospital on November 14, 2008, revealed the presence of oxycodone at a level of 0.06 mg/L, and diazepam at a level of 0.04 mg/L. These levels were considered to be therapeutic as they were of a concentration range typically expected when the drugs were used as prescribed by a physician. C.C.J. did not, however, have a prescription for the drugs that were found in his system, nor had the controlled substances been administered by the hospital or physicians in the course of his immediate treatment following his collapse on November 14, 2008.

On May 22, 2009, Detective Sizemore obtained an arrest warrant for the Petitioner charging him with "death of a child by a parent" in violation of W.Va. Code §61-8D-2a. The Petitioner was subsequently arrested on the warrant on May 27, 2009.

On July 28, 2009, Dr. Zia Sabet and Dr. Kaplan issued a "Report of Death Investigation and Post-Mortem Examination Findings" wherein the two doctors opined "that [C.C.J.], a 14-year-old male teenager, died as the result of combined oxycodone and diazepam intoxication resulting in fatal hypoxic encephalopathy following a 5-day hospitalization, without documented prescription access to oxycodone and diazepam. Cystic Fibrosis and insulin dependent diabetes mellitus are potentially contributory conditions." The report further reflects that it was the doctors' opinion that "[g]iven the uncertain circumstances surrounding the acquisition and fatal abuse of pharmaceuticals by this minor child, as well as the potentially contributory role of unreported caretaker neglect to provide timely medical rescue, the manner of death is best classified as undetermined."

On September 9, 2009, a Fayette County Grand Jury returned an indictment against the Petitioner for the criminal offenses of felony murder in violation of W.Va. Code § 61-2-1;

-3-

delivery of a controlled substance, to-wit oxycodone, in violation of W.Va. Code § 60A-4-401; death of a child by a parent, guardian or custodian in violation of W.Va. Code § 61-8D-2a; and child neglect resulting in death in violation of W.Va. Code § 61-8D-4a(a).

Petitioner's jury trial began on May 4, 2010. Prior to any testimony being presented, the State orally moved to dismiss Count Four of the indictment, child neglect resulting in death in violation of W.Va. Code § 61-8D-4a(a). The Court granted the State's motion. The Court then proceeded with Petitioner's trial on the remaining counts of the indictment.

Evidence adduced at Petitioner's trial revealed that on the evening of November 13, 2008, Holly Burdette arrived at the Petitioner's home around 10:00 p.m. in response to a call from C.C.J. requesting a ride for both he and the Petitioner. Ms. Burdette, Marshall Walker, and Shaun Stark were drinking together, and as Ms. Burdette did not have a vehicle, she asked them to give Petitioner and C.C.J. a ride. After picking up C.C.J. and the Petitioner, they all travelled to the home of Josh Settle, a local drug dealer, where Petitioner went inside Mr. Settle's residence and traded a bag of C.C.J.'s Nascar memorabilia collection for three oxycodone '30' pills. Mr. Settle testified that C.C.J. was not in the residence at the time the pills were exchanged. Once the trade was complete, the Petitioner exited the residence with Mr. Settle, where they conversed for a short time. At Mr. Settle's request, Petitioner, C.C.J., and Mr. Settle went back into the residence so that Mr. Settle could show C.C.J. a knife. Shortly thereafter, Petitioner and C.C.J. exited, got back into the car, and returned to Petitioner's residence.

Ms. Burdette testified at trial that she had observed only two of the three oxycodone pills that Petitioner had obtained from Mr. Settle. After receiving one of the pills from the Petitioner, Ms. Burdette and Mr. Stark went to a neighbor's trailer. After a short time visiting with the

-4-

occupants of the neighboring trailer, Ms. Burdette and Mr. Stark returned to the Petitioner's trailer. Upon their return, Ms. Burdette found C.C.J. on the front porch vomiting. Ms. Burdette testified that over the next hour or so she observed that C.C.J. had dilated eyes, was scratching himself, and that he vomited again. Ms. Burdette further testified that when she asked the Petitioner what was going on, the Petitioner had responded that C.C.J. had "done" a little bit of the oxycodone. During the ensuing hours, C.C.J. had fallen asleep while the Petitioner and Ms. Burdette remained awake. Ms. Burdette testified that C.C.J. had awakened once and vomited again, but that C.C.J. had indicated that he felt better and just wanted to go to sleep rather than going to a hospital. Eventually the Petitioner had fallen asleep on the couch, while Ms. Burdette had slept on a mattress on the floor with Mr. Stark.

Ms. Burdette testified that when she awoke the following morning, Petitioner was awake sitting in a chair, smoking a cigarette, and talking on the phone. Ms. Burdette testified that the Petitioner asked her for a valium and she went to retrieve him one from her purse, where she discovered that all but two (2) of her recently filled ninety (90) pill prescription were gone. At approximately this same time, Ms. Burdette noticed a loud gurgling noise coming from C.C.J. Upon attempting to wake C.C.J., Ms. Burdette discovered that C.C.J. was not breathing and had a faint pulse. Mr. Stark then began attempting to revive C.C.J. by administering CPR and Ms. Burdette directed the Petitioner to call 911. The Petitioner was receiving phone calls and did not call 911 at that time.

There was conflicting testimony adduced at Petitioner's trial regarding the length of time resuscitation efforts were attempted prior to the Petitioner contacting 911. State witness, Holly Burdette, and Defense witness, Marshall Walker, testified that it was approximately thirty (30)

-5-

minutes to an hour, while Defense witness, Shaun Stark, testified that it was from ten (10) to fifteen (15) minutes. Testimony was consistent, however, that Mr. Stark and Ms. Burdette initially attempted CPR after discovering C.C.J. was in distress; the Petitioner, Mr. Stark, and Ms. Burdette attempted to move C.C.J. into the bathroom to revive C.C.J. through the use of cold water; and C.C.J. was moved back into the living room where Mr. Stark resumed CPR, prior to the Petitioner contacting emergency services.

At 10:20 a.m. on November 14, 2008, EMS responded to a 911 call from the Petitioner's home. The caller reported that a fourteen year old male was experiencing shortness of breath. Upon the arrival of the ambulance, EMS personnel found C.C.J. not breathing and in full cardiac arrest. C.C.J. was transported by ambulance to Plateau Medical Center and was subsequently transported to Women and Children's Hospital in Charleston, West Virginia, where he remained hospitalized in a vegetative state until his death on November 19, 2008.

Ms. Burdette testified that Petitioner told her approximately a week after C.C.J.'s death, that he felt responsible for C.C.J.'s death because he had shot C.C.J. up with an Oxycontin 30. Moreover, tape recorded phone conversations between the Petitioner and C.C.J.'s mother, Naomi Griffith, while she was incarcerated at Lakin Correctional Facility, were obtained by the investigating officer, Detective J.K. Sizemore, and admitted into evidence at Petitioner's trial. During one of these conversations, Petitioner admitted to Ms. Griffith that C.C.J. had "snorted" a "30". In another conversation, Petitioner advised Ms. Griffith that C.C.J. had been obtaining drugs from "other places too." Ms. Griffith further testified about two prior incidents preceding C.C.J.'s death, where the Petitioner had admitted to having given C.C.J. controlled substances (klonopin and valium) which were not prescribed to C.C.J.

-6-

Dr. Zia Sabet testified that scratching sensitive skin areas and vomiting were some of the immediate side effects caused by the consumption of an opiate drug. Dr. Sabet further testified that scratches that were present on C.C.J.'s back were indicative of the typical effects of opiate use. Dr. Sabet also testified on direct, cross, and re-direct examination that, due to C.C.J.'s medical condition, oxycodone and diazepam intoxication contributed to C.C.J.'s death.

At the conclusion of all testimony and the closing arguments of counsel, the jury received instructions from the Court. As part of these instructions, the jury was instructed that the charge previously contained in count four, "child neglect resulting in death", was a lesser included offense of count three, "death of a child by a parent". The jury was then left to their deliberation.

During deliberation, the jury submitted a handwritten note to the Court wherein the Jury asked the following question: "Does the felony that was committed have to cause the death or contribute to it?" After considerable discussion between the Court and counsel, the Court passed a note back to the jury stating,

> Ladies and gentlemen of the jury, I have received your note and regret that I am unable to further answer the question you asked. I know you were attentive to the instructions as they were read to you by the Court. They cannot be read to you again. Each individual should rely upon their own memory in answering the question. You may now continue to deliberate toward verdicts in this case.

Following several more hours of deliberation, the jury returned a verdict finding the Petitioner guilty of the offense of felony murder with a recommendation of mercy, and guilty of the offense of child neglect resulting in death as a lesser included offense of death of a child by a parent, guardian or custodian.

-7-

## RELEVANT POST-CONVICTION PROCEDURAL HISTORY AND GENERAL FINDINGS OF FACT

1. On June 23, 2010, as reflected in the Court's *Sentencing And Commitment Order* entered June 28, 2010, the Court sentenced the Petitioner to life with a recommendation of mercy on the count of felony murder, and three to fifteen years on the count of "child neglect resulting in death." The Court further ordered that the sentences were to be served consecutively.

2. On July 16, 2010, Petitioner, *pro se*, filed a *Notice Of Intent To Appeal*.

3. On July 27, 2010, Petitioner, by and through counsel, E. Scott Stanton, Esq., filed a second *Notice Of Intent To Appeal*.

4. On October 28, 2010, the Court entered an *Agreed Resentencing Order* wherein the Court resentenced the Petitioner for purposes of appeal due to Petitioner experiencing a delay in receiving the trial transcripts.

5. On February 28, 2014, the Petitioner, by and through counsel, E. Scott Stanton, Esq., filed a petition for appeal with the West Virginia Supreme Court of Appeals. Petitioner raised the following six (6) issues on appeal:

   1) The circuit court erred in allowing the State to proceed against him for the offenses of felony murder, the underlying felony being delivery of oxycodone; death of a child by a parent, the cause of death being impairment of physical condition by delivery of oxycodone; and child neglect resulting in death, the neglect allegedly being allowing or permitting child to abuse oxycodone.

   2) In proceeding under a felony murder theory, the State's evidence was insufficient to prove that: 1) the delivery of the oxycodone itself caused the death of C.C.J. and 2) that Petitioner delivered either of the controlled substances, oxycodone or valium, to C.C.J.

   3) The jury did not receive proper instructions.

-8-

4) The circuit court erred in its decision to suppress Petitioner's prior statement to law enforcement only for purposes of the State's case in chief.

5) The circuit court erred in permitting the state to admit photographs taken of C.C.J.'s body during the autopsy.

6) The circuit court erred in permitting the use of 404(b) evidence regarding certain prior incidents where C.C.J. had obtained controlled substances with Petitioner's knowledge and cooperation.

6. On June 21, 2012, by *per curiam* opinion, the West Virginia Supreme Court of Appeals affirmed the Petitioner's conviction.

7. On August 30, 2012, the Petitioner, *pro se*, filed a *Petition Under W.Va. Code §53-4A-1 For Writ Of Habeas Corpus* and attachments.

8. On September 11, 2012, the Court entered an *Order Appointing Counsel* wherein the Court appointed Thomas K. Fast, Esq., as habeas counsel for the Petitioner ("*Habeas Counsel*") and directed *Habeas Counsel* to file an amended omnibus habeas corpus petition.

9. On April 26, 2014, the Petitioner filed a *Pleading with Losh v. McKenzie List* ("*Losh List*") wherein the Petitioner listed the following twenty-nine (29) alleged grounds he intended to assert in the habeas proceeding:

1) Statute under which conviction obtained unconstitutional;
2) Indictment shows on face no offense was committed;
3) Prejudicial pre-trial publicity;
4) Denial of counsel;
5) Consecutive sentences for same transaction;
6) Coerced confessions;
7) Suppression of helpful evidence by prosecutor;
8) State's knowing use of perjured testimony;
9) Information in pre-sentence report erroneous;
10) Ineffective assistance of counsel;
11) Double jeopardy;
12) Irregularities in arrest;

-9-

13) Challenges to the composition of grand jury or its procedures;
14) Defects in indictment;
15) Improper venue;
16) Refusal to subpoena witnesses;
17) Non-disclosure of Grand Jury minutes;
18) Refusal to turn over witness notes opposed to time of trial;
19) Claims concerning use of informers to convict;
20) Constitutional errors in evidentiary rulings;
21) Instructions to the jury;
22) Claims of prejudicial statements by prosecutor;
23) Sufficiency of evidence;
24) Severer sentence than expected;
25) Excessive sentence;
26) Ex Post Facto Law;
27) Refusal to allow lesser included offense;
28) Cumulative effect of numerous errors;
29) Newly discovered evidence.

10. On October 2, 2013, the Court entered an agreed *Habeas Corpus Proceeding Scheduling and Transport Order* submitted by the parties, wherein the following guidelines were established:

1) An amended petition was to be filed by October 4, 2013;

2) Any responsive pleading was to be filed no later than November 1, 2013; and

3) An omnibus habeas corpus evidentiary hearing was scheduled for January 6, 2014, at 9:00 a.m.

11. On October 31, 2014, Petitioner, by and through, *Habeas Counsel*, filed a *Motion To Amend Scheduling Order To Enlarge Time*.

12. On December 23, 2013, following a hearing on Petitioner's motion, the Court entered an *Order* wherein the previously established guidelines were amended as follows:

1) Amended petition to be filed on or before February 14, 2014;

2) Any responsive pleading to be filed on or before March 14, 2014;

-10-

3) List of witnesses to be filed by May 2, 2014; and

4) An omnibus habeas corpus evidentiary hearing to commence on May 5, 2014, at 9:00 a.m.

13. On February 14, 2014, the Petitioner, by and through *Habeas Counsel*, filed an *Amended Petition For A Writ Of Habeas Corpus Ad-Subjiciendum* (*"Amended Petition"*) wherein the Petitioner incorporated the twenty-nine (29) grounds for relief previously listed in the *Losh List* into the following twelve (12) contentions:

1) Defects in the indictment and jury instructions;

2) The Court improperly instructed the jury;

3) Petitioner was denied his constitutional right to counsel [ineffective assistance of counsel];

    1. Telling the jury there was proof of delivery.

    2. Failure to object to lay witness' opinion on legal weight of evidence.

    3. Failure to object to inappropriate prejudicial comments of the prosecution.

    4. Failure to disclose or call any expert witnesses.

    5. Failure to object to extensive leading questions.

    6. Failure to object to substantive testimony over exhibits marked for identification only.

    7. Failure to object and seek curative instruction over lay witnesses testifying as experts.

    8. Failing to object and seek curative instruction over inappropriate bolstering of other witnesses' credibility.

    9. Failure to have authenticating witness.

    10. Failing to establish when blood was drawn.

-11-

4) The Petitioner was unfairly prejudiced by statements of the prosecutor;

5) Petitioner asserts that he was subjected to multiple punishments for the same criminal actions violating double jeopardy principles;

6) Petitioner incurred prejudicial pre-trial publicity;

7) Petitioner was subjected to irregularities in his arrest;

8) Petitioner's trial counsel refused to subpoena witnesses necessary for his trial;

9) Constitutional errors in evidentiary rulings;

10) The evidence was insufficient;

11) Petitioner's rights were violated for refusal to allow the lesser included offense of voluntary manslaughter; and

12) Petitioner is entitled to a new trial due to the cumulative effect of all the aforementioned errors and violations of his rights.

14. On May 5, 2014, an omnibus habeas corpus evidentiary hearing was conducted in the matter ("*Omnibus Hearing*"). Prior to the Court taking testimony, the Petitioner acknowledged on the record that the *Losh List* was a complete and accurate reflection of those grounds for relief that the Petitioner wished to assert and that, with the assistance of counsel, he was waiving all other grounds not asserted in the *Losh List*. The Court then proceeded to hear the testimony of Nancy S. Fraley, Esquire ("*Trial Co-Counsel*"), and E. Scott Stanton, Esquire ("*Trial Counsel*") (both referred to collectively as "*Counsel*"). At the conclusion of the hearing, the Court recessed the matter until May 14, 2014.

15. On May 14, 2014, the Court resumed the *Omnibus Hearing*. At this hearing the Petitioner testified and *Trial Counsel* was called to testify as a rebuttal witness. At the conclusion of the hearing the Court directed the Petitioner to submit proposed findings of fact and

-12-

conclusions of law by August 15, 2014. The Court further directed the Respondent to file proposed findings of fact and conclusions of law within thirty days of Petitioner's filing.

16. On August 15, 2014, counsel for the Petitioner filed *Proposed Findings Of Fact And Conclusions Of Law Submitted By Petitioner* for the Court's consideration.

17. On September 22, 2014, counsel for the Respondent filed *Findings Of Fact And Conclusions Of Law Regarding Petition For Habeas Corpus Relief* for the Court's consideration.

## ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW

The right to petition the Court for a post-conviction writ of habeas corpus is guaranteed by the West Virginia Constitution, Article III, Section Four. Post conviction habeas corpus proceedings are governed by the *West Virginia Rules Governing Post Conviction Habeas Corpus Proceedings in West Virginia*, (referred to hereinafter as "Rule" or "Rules"), and West Virginia Code §53-4A-1, *et seq*. Pursuant thereto, this Court finds that it has jurisdiction over the subject matter of this proceeding.

In general, the post-conviction habeas corpus statute, W.Va.Code, 53-4A-1 et seq. (1967) contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal, and one omnibus post-conviction habeas corpus hearing at which he may raise any collateral issues which have not previously been fully and fairly litigated. Losh v. McKenzie, 166 W. Va. 762, 764, 277 S.E.2d 606, 609 (1981). A person convicted of a crime is ordinarily entitled to only one post-conviction habeas corpus proceeding. *See* Syl. Pt. 1, in part, Gibson v. Dale, 173 W.Va. 681, 319 S.E.2d 806 (1984); Syl. Pt. 1, Markley v. Coleman, 215 W.Va. 729, 731, 601 S.E.2d 49, 51 (2004), *per curiam*.

-13-

The Petitioner is currently incarcerated at Mount Olive Correctional Complex on sentences imposed by this Court as a result of a Fayette County Petit Jury convicting him of murder in the first degree, a felony, as a result of the death of C.C.J. occurring during the commission of the felony crime of delivery of a controlled substance, with a recommendation of mercy and guilty of the offense of child neglect resulting in death as a lesser included offense of death of a child by a parent. The Court finds that Petitioner's *Losh List, Amended Petition*, and the contentions asserted therein, are appropriately before this Court for consideration.

At the omnibus habeas corpus hearing, a petitioner is required to raise all grounds known or that reasonably could be known by the petitioner. Markley v. Coleman, 215 W. Va. 729, 732-33, 601 S.E.2d 49, 52-53 (2004). "[A] [c]ircuit court denying or granting relief in [a] habeas corpus proceeding is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by petitioner, and to state [the] grounds upon which [the] matter was determined." Syl. Pt. 4, Markley v. Coleman, 215 W. Va. 729, 731, 601 S.E.2d 49, 51 (2004); *See* Syl. Pt. 1, State ex rel. Watson v. Hill, 200 W.Va. 201, 488 S.E.2d 476 (1997); *See also* Syl. Pt. 8, State ex rel. Vernatter v. Warden, West Virginia Penitentiary, 207 W.Va. 11, 14, 528 S.E.2d 207, 210 (1999).

The Petitioner raises a total of twenty-nine (29) grounds for relief in his *Losh List* and *Amended Petition*. The Court will now proceed to address each of the grounds raised by the Petitioner.

    **I.**     **Grounds That Have Been Previously Adjudicated On The Merits or That The Petitioner Knowingly And Intelligently Failed To Assert On Direct Appeal**

-14-

The Petitioner appealed his conviction and sentence to the West Virginia Supreme Court of Appeals. Following the West Virginia Supreme Court of Appeals issuing an opinion in that matter, the Petitioner initiated the subject proceeding wherein Petitioner asserted a total of twenty-nine (29) grounds for relief in his *Losh List* and subsequently combined many of the twenty-nine (29) grounds into the twelve (12) contentions raised in Petitioner's *Amended Petition*.

The Court notes that the *Losh List* is extensive and the *Amended Petition* is convoluted and unfocused. *See generally* Losh v. McKenzie, 166 W. Va. 762, 770, 277 S.E.2d 606, 612 (1981) (noting 1) that generally only a few grounds will be applicable in any habeas proceeding; 2) that it is habeas counsel's responsibility to focus the issues; and 3) that the *Losh List* should not be abused). The *Amended Petition* combines many points raised in Petitioner's *Losh List* under various alleged contentions and title headings, while essentially putting forth the same substantive arguments that were previously put forth on direct appeal and in proceedings before the Trial Court. Additionally, some contentions that were raised and argued on direct appeal are simply raised again in this habeas proceeding with altered or slightly modified substantive arguments. Be that as it may, this Court remains mindful that in considering the contentions put forth by the Petitioner, substance, not form, controls. *See* W. Va. Code § 53-4A-6 (West).

The Court will now address those grounds that have been fundamentally and essentially raised in prior proceedings or were known and could have been raised in prior proceedings.

West Virginia Code §53-4A-1 provides, in relevant part, that a person convicted of a crime and incarcerated under a sentence of imprisonment may file a petition for writ of habeas corpus ad subjiciendum asserting certain grounds and seeking release,

-15-

if and only if such contention or contention and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceeding which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence.

W. Va. Code §53-4A-1(a). West Virginia Code §53-4A-1 clearly defines the circumstances under which a contention is deemed to have been previously and finally adjudicated, as well as when a contention is deemed to have been previously waived.

[A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been previously and finally adjudicated only when at some point in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, there was a decision on the merits thereof after a full and fair hearing thereon and the time for the taking of an appeal with respect to such decision has not expired or has expired, as the case may be, or the right of appeal with respect to such decision has been exhausted, unless said decision upon the merits is clearly wrong.

West Virginia Code §53-4A-1(b).

[A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced, but intelligently and knowingly failed to advance, such contention or contentions and grounds before trial, at trial, or on direct appeal (whether or not said petitioner actually took an appeal), or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, unless such contention or contentions and grounds are such that, under the Constitution of the United States or the constitution of this state, they cannot be waived.

West Virginia Code §53-4A-1(c).

The West Virginia Supreme Court of Appeals previously analyzed W.Va. Code §53-4a-1 and provided a thorough explanation of the Court's application of the concepts of final

-16-

adjudication and waiver in relation to grounds asserted in a habeas corpus proceeding. *See* <u>Losh v. McKenzie</u>, 166 W. Va. 762, 277 S.E.2d 606 (1981); *See also* <u>Ford v. Coiner</u>, 156 W. Va. 362, 196 S.E.2d 91 (1972).

In terms of final adjudication, a habeas petitioner may seek review of a collateral issue if that issue has not previously been fully and fairly litigated during the trial, on appeal, or during a prior habeas corpus proceeding. *See* 53-4A-1(b); *See also* <u>Losh v. McKenzie</u>, 166 W. Va. at 764, 277 S.E.2d at 609. An issue has been fully and fairly litigated when at some stage in the past proceedings, the proponent raises and argues the issue and the presiding court makes a decision on the merits of that issue. <u>Losh v. McKenzie</u>, 166 W. Va. at 766-67, 277 S.E.2d at 610.

Collateral issues which were known, or with reasonable diligence could have been known, at the time of a prior proceeding, and were not raised by a petitioner in that proceeding, are presumed to have been knowingly and intelligently waived. *See* <u>Ford v. Coiner</u>, 156 W. Va. at 367-68, 196 S.E.2d at 95 (emphasizing that the issue must have been known or could have been known at the time of the prior proceeding); *See also* <u>Losh v. McKenzie</u>, 166 W. Va. at 765-67, 277 S.E.2d at 609-10 (noting that the question of whether the issue was known or reasonably could have been known must be answered based upon surrounding facts and circumstances). The knowing and intelligent waiver of issues that could have been raised in a prior proceeding, but were not raised, is further solidified when a petitioner was represented by counsel during the prior proceeding. *See generally* <u>Losh v. McKenzie</u>, 166 W. Va. at 765-67, 277 S.E.2d at 609-10.

The Petitioner raised the following assignments of error on direct appeal to the West Virginia Supreme Court of Appeals: 1) Election of Charges; 2) Sufficiency of Evidence; 3) Jury Instructions; 4) Suppression of Petitioner's Statement; 5) Gruesome Photographs; and 6) 404(b)

-17-

Evidence. *See* State v. Jenkins, 229 W. Va. 415, 729 S.E.2d 250 (2012). On appeal, the Petitioner raised, and the Supreme Court of Appeals subsequently addressed, various issues under Petitioner's election of charges and sufficiency of evidence assignments of error. By per curiam opinion, the Supreme Court of Appeals fully adjudicated all of these issues on the merits. *Id.* The Petitioner now attempts to raise many of these same issues that were previously addressed by the Supreme Court of Appeals and/or by the Trial Court, by only slightly modifying the form of the contention and putting forth, for all intent and purpose, the same substantive argument.

After a thorough review of the record, the *Losh List*, the *Amended Petition*, and the opinion issued by the West Virginia Supreme Court of Appeals, this Court finds and concludes that the following grounds contained in Petitioner's *Losh List* have been substantively addressed and fully and fairly adjudicated either upon direct appeal or in an underlying proceeding before the Trial Court: 1) Coerced confessions; 2) Double jeopardy; 3) Constitutional errors in evidentiary rulings; 4) Instructions to the jury; 5) Consecutive sentences for the same transaction and 6) Sufficiency of the evidence.

Although not incorporated into the Petitioner's *Amended Petition*, the Petitioner also raised the issue of the admission of 404(b) evidence once again in his *Original Petition*. This Court finds that the contention concerning the admission of 404(b) evidence had also been fully and fairly adjudicated by the Supreme Court of Appeals on direct appeal.

Further, in as much as the foregoing grounds have been slightly modified and reasserted in this habeas proceeding, this Court also finds: 1) that the Petitioner was well aware of the facts and circumstances that served as the basis for the grounds asserted on direct appeal, 2) that, at

-18-

the time of the direct appeal, the Petitioner could have advanced, but did not advance, all of the possible alternative arguments regarding the grounds asserted on direct appeal, and 3) that the Petitioner has failed to overcome the presumption that he knowingly and intelligently failed to advance other alternative arguments on those grounds previously asserted on direct appeal. Based upon the foregoing, this Court finds and concludes that the Petitioner knowingly and intelligently waived those alternative arguments not advanced on the contentions or grounds previously asserted on direct appeal.

The Petitioner also asserts in the *Losh List* and the *Amended Petition* that irregularities in his arrest violated his constitutional rights. The Petitioner's *Amended Petition* and omnibus hearing testimony raises this issue only in the context of a statement that was given to law enforcement at the time of Petitioner's arrest. The Petitioner offered this Court no other explanation as to how irregularities in Petitioner's arrest violated Petitioner's fundamental constitutional rights or adversely affected Petitioner's trial.

In a pre-trial proceeding to suppress the statement taken at the time of arrest, this Court, finding that the purpose and manner of conduct of the interview was to induce a statement, suppressed the use of the statement during the State's case in chief but permitted the State to use the statement for impeachment purposes on rebuttal if the Petitioner chose to testify at trial. *See* April 27, 2010, *Motions Hearing Transcript*, pp. 30-32; *See also Order* entered May 6, 2010. On direct appeal, the Petitioner raised the issue regarding the circumstances surrounding the arrest and the Court's subsequent ruling on the use of the improperly obtained statement. *See Jenkins*, 229 W. Va. at 432, 729 S.E.2d at 267. Based upon a review of these past proceedings, this Court finds that the issue, regarding the statement that was obtained as a result of the irregularities in

-19-

Petitioner's arrest, was fully adjudicated both before the Trial Court during pre-trial proceedings and before the West Virginia Supreme Court of Appeals on direct appeal.

In addition to Petitioner's irregularities in arrest argument failing because it was previously adjudicated, it also fails because it is not cognizable in this habeas proceeding. The mere fact that Petitioner may have been subjected to irregularities during his arrest, in and of itself, does not warrant relief in habeas corpus. "Imprisonment under the process or order of a court of competent jurisdiction, however irregular or erroneous, not being void, is not illegal imprisonment, so as to warrant discharge on habeas corpus." Syl. Pt. 2, Ex parte Evans, 42 W. Va. 242, 24 S.E. 888 (1896). Even when alleged errors and irregularities are supported by the record, if they do not infringe upon a fundamental state or federal constitutional right, they are simply not reviewable in a habeas proceeding. *See* Syl. Pt. 1, 2, id. (explaining that mere irregularity and error in process or proceedings not sufficient to warrant remedy in habeas corpus); *See also* United States v. Mechanik, 475 U.S. 66, 71-72, 106 S. Ct. 938, 942, 89 L. Ed. 2d 50 (1986) (providing that errors, defects, irregularities, or variances not affecting substantial rights shall be disregarded).

In the case at bar, the Court prohibited the prosecution from using Petitioner's arrest statement in the prosecution's case in chief. Although the prosecution was permitted to use the statement on rebuttal if the Petitioner chose to testify, the prosecution actually did not utilize the statement for any purpose during Petitioner's trial. Since the statement was not used by the prosecution for any purpose, the Petitioner was not prejudiced in the presentation of his case at trial. As such, this Court finds and concludes that the alleged irregularities in Petitioner's arrest simply do not rise to a constitutional level cognizant in this habeas proceeding.

-20-

## II.    Random Grounds Abandoned And Waived For Lack Of Support

The Petitioner fails to provide any evidence, argument, or explanation in support of many

of the remaining twenty-three (23) grounds asserted in the Petitioner's *Losh List*.

A habeas petitioner bears the burden of establishing by a preponderance of the evidence

that he is entitled to the relief sought. *See* Syl. Pt. 1, 2, State ex rel. Scott v. Boles, 150 W. Va.

453, 147 S.E.2d 486, 487 (1966). A petitioner must establish that his contention has merit; relief

will not be granted in habeas corpus for claims which are undeveloped by a petitioner and not

adequately supported by the record. *See* Markley v. Coleman, 215 W. Va. 729, 734, 601 S.E.2d

49, 54 (2004) (per curiam) citing Losh v. McKenzie, 166 W. Va. 762, 771, 277 S.E.2d 606, 612

(1981) (noting that allegations must have adequate factual support for appointment of counsel,

hearing, or issuance of the writ); *See also* n. 7, id. (drawing a distinction between habeas corpus

allegations asserted that lack adequate factual support warranting review and randomly selected

habeas corpus allegations that are without merit because they are undeveloped and unsupported

by the record). "[A] [mere] skeletal 'argument,' really nothing more than an assertion, does not

preserve a claim." State ex rel. Hatcher v. McBride, 221 W. Va. 760, 766, 656 S.E.2d 789, 795

(2007) quoting State Dept. Of Health v. Robert Morris N., 195 W.Va. 759, 765, 466 S.E.2d 827,

833 (1995) (alterations from original).

Among the remaining twenty-three (23) grounds asserted in Petitioner's *Losh List*, the

Petitioner asserts the following eleven (11) grounds for relief: 1) Statute under which conviction

obtained unconstitutional, 2) Suppression of helpful evidence by prosecutor, 3) State's knowing

use of perjured testimony, 4) Information in pre-sentence report erroneous, 5) Challenges to the

-21-

composition of grand jury or its procedures, 6) Non-disclosure of grand jury minutes, 7) Refusal to turn over witness notes opposed to time of trial, 8) Claims concerning use of informers to convict, 9) Severer sentence than expected, 10) Ex Post Facto Law, and 11) Denial of counsel (the "*Eleven Alleged Grounds for Relief*").

In the case of each of the *Eleven Alleged Grounds for Relief*, the Petitioner failed to present any substantive evidence, testimony, or argument to support the allegations. Each of the *Eleven Alleged Grounds for Relief* remained unfocused throughout this habeas corpus proceeding and it appears to this Court that the *Eleven Alleged Grounds for Relief* are simply randomly selected, unsupported assertions. Moreover, a thorough review of the record and relevant law does not reveal even a modicum of support for any of the *Eleven Alleged Grounds for Relief*.

In any event, even if this Court assumes, *arguendo*, that the record and/or relevant law offers some support for Petitioner's *Eleven Alleged Grounds for Relief*, the Petitioner did not provide any examples, analysis, explanation, legal citation, argument or proof, to show how habeas relief is warranted based upon any of the *Eleven Alleged Grounds for Relief* or how Petitioner's state or federal constitutional rights were implicated as a result of any of the *Eleven Alleged Grounds for Relief*. It is the Petitioner's responsibility to develop the asserted grounds and show by a preponderance of the evidence that habeas relief is warranted. *See* Syl. Pt. 1, 2, State ex rel. Scott v. Boles, 150 W. Va. at 453, 147 S.E.2d at 487. This Court will not develop Petitioner's arguments for him. *See generally* State ex rel. Hatcher v. McBride, 221 W. Va. at 766, 656 S.E.2d at 795 ("Judges are not like pigs, hunting for truffles buried in briefs.").

-22-

Based upon the foregoing, this Court finds and concludes that each of the following *Eleven Alleged Grounds for Relief* are without merit and have been knowingly and intelligently abandoned and waived by the Petitioner: 1) Statute under which conviction obtained unconstitutional, 2) Suppression of helpful evidence by prosecutor, 3) State's knowing use of perjured testimony, 4) Information in pre-sentence report erroneous, 5) Challenges to the composition of grand jury or its procedures, 6) Non-disclosure of grand jury minutes, 7) Refusal to turn over witness notes opposed to time of trial, 8) Claims concerning use of informers to convict, 9) Severer sentence than expected, 10) Ex Post Facto Law, and 11) Denial of counsel.

## III.     Alleged Deficiencies and Defects In The Indictment

The Petitioner alleges in his *Losh List* and *Amended Petition* that the indictment upon which Petitioner's conviction was based, was both deficient and defective.

The United States Supreme Court has previously addressed the two minimum criteria necessary for an indictment to be constitutionally sufficient: 1) the indictment must provide the defendant with enough information to allow him to prepare a defense and to protect him against further prosecution for the same offense; and 2) the indictment must describe the charge with enough certainty for a court to determine whether the facts are sufficient in law to support a conviction. *See* United States v. Cruikshank, 92 U.S. 542, 557-58, 23 L. Ed. 588, 593 (1875).

With only slight modifications, the West Virginia Supreme Court has adopted similar criteria for testing the constitutional sufficiency of an indictment. *See* State v. Childers, 187 W.Va. 54. *Childers* confirmed that to be constitutionally sufficient in West Virginia, an indictment must: 1) clearly state the nature and cause of the accusation against a defendant, enabling him to prepare his defense and plead his conviction as a bar to later prosecution for the

-23-

same offense; and 2) substantially follow the language of the statute, fully inform the accused of the particular offense with which the accused is charged and enable the court to determine the statute on which the charge is based. *See* Syl. Pt. 1 & 2, id., at 55, 415 S.E.2d at 461; *See also* State ex rel. Thompson v. Watkins, Syl. Pt. 4, 200 W. Va. 214, 215, 488 S.E.2d 894, 895 (1997); Syl. Pt. 8 & 9, State v. George W.H., 190 W. Va. 558, 569, 439 S.E.2d 423, 434 (1993); Syl. Pt. 3, State v. Hall, 172 W.Va. 138, 304 S.E.2d 43 (1983); Syl. Pt. 1, State v. Mullins, 181 W.Va. 415, 383 S.E.2d 47 (1989).

Since an indictment is the charging document, any challenge to the validity of an indictment should be made by a defendant prior to conviction. *See* State ex rel. Thompson v. Watkins, 200 W. Va. 214, 488 S.E.2d 894 (1997). As the Supreme Court of Appeals noted in *Watkins*,

> "Rule 12(b)(2) of the West Virginia Rules of Criminal Procedure requires that a defendant must raise any objection to an indictment prior to trial. Although a challenge to a defective indictment is never waived, this Court literally will construe an indictment in favor of validity where a defendant fails timely to challenge its sufficiency. Without objection, the indictment should be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense under West Virginia law or for which the defendant was convicted."

Syl. Pt. 3, State ex rel. Thompson v. Watkins, 200 W. Va. 214, 215, 488 S.E.2d 894, 895 (1997) citing Syl. Pt. 1, State v. Miller, 197 W.Va. 588, 476 S.E.2d 535 (1996).

The Petitioner had the opportunity to raise the issue regarding the sufficiency of the indictment before this Court prior to his conviction, and before the West Virginia Supreme Court of Appeals on direct appeal. This issue, however, was untimely raised for the first time here in this habeas proceeding.

In the case at bar, the Petitioner's indictment, in relevant part, reads as follows:

-24-

. . . **HENRY C. JENKINS** on or about the 14th day of November, 2008 in the said County of Fayette,

## COUNT ONE

committed the offense of "murder" in that he did unlawfully, feloniously, willfully, maliciously and deliberately slay, kill and murder C.C.J., during the commission of the felony offense of delivering to said C.C.J. oxycodone, a schedule II narcotic controlled substance, against the peace and dignity of the State.

W. Va. Code § 61-2-1

## COUNT TWO

. . . committed the offense of "delivery of a controlled substance" in that he did unlawfully, feloniously, knowingly and intentionally deliver a Schedule II controlled substance, to-wit: oxycodone, against the peace and dignity of the State.

W. Va. Code § 60A-4-401

## COUNT THREE

. . . committed the offense of "death of a child by parent" in that he did unlawfully, feloniously, maliciously and intentionally inflict upon C.C.J., a child under his care, custody or control, impairment of physical condition, by other than accidental means, thereby causing the death of the said C.C.J., against the peace and dignity of the State.

W.Va. Code § 61-8D-2a

## COUNT FOUR

. . . committed the offense of "child neglect resulting in death" in that **HENRY C. JENKINS**, the parent of C.C.J. who was under his care, custody or control failed to get C.C.J. timely necessary medical treatment and/or allowed or permitted him to abuse controlled substances and such neglect resulted in the death of said C.C.J[.], against the peace and dignity of the State.

W. Va. Code § 61-8D-4a(a)

*See* Indictment No. 09-F-136.

Petitioner was convicted of "felony murder" as contained in Count One of the indictment and "child neglect resulting in death" as contained in Count Four, as a lesser included offense of "death of a child by parent" as contained in Count Three of the indictment.

West Virginia Code § 61-2-1 provides that

-25-

[m]urder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

W. Va. Code Ann. § 61-2-1 (West).

West Virginia Code § 61-8D-2a, in relevant part, provides

[i]f any parent, guardian or custodian shall maliciously and intentionally inflict upon a child under his or her care, custody or control substantial physical pain, illness or any impairment of physical condition by other than accidental means, thereby causing the death of such child, then such parent, guardian or custodian shall be guilty of a felony.

W. Va. Code Ann. § 61-8D-2a (West).

Lastly, West Virginia Code § 61-8D-4a, in relevant part, provides "[i]f any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony . . .." W. Va. Code Ann. § 61-8D-4a (West).

A thorough review of the indictment in this case offers some explanation of Petitioner's untimeliness, since this Court finds that the indictment clearly places the Petitioner on notice of the nature and cause of the charges against him and that Counts One, Three, and Four of the indictment substantially follow the language contained in each of the relevant criminal statutes.

-26-

As such, this Court finds and concludes that the Petitioner's allegation that the indictment was deficient and defective on its face is wholly without merit.

Having determined that the indictment is valid and proper on its face, the Court will now address Petitioner's primary argument regarding the indictment. The crux of Petitioner argument is that since the grand jury expressly handed down an indictment for "murder" which contained the elements of malice, deliberation, and willfulness, the State was required to prove those elements to obtain a conviction for felony murder. The Petitioner further argues that the Court improperly instructed the jury to disregard these elements. *See* Discussion *supra*, Sect. I, pp. 20-26.

Petitioner's argument, however, clearly ignores established law within this jurisdiction.

> An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under W. Va.Code, 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

Syl. Pt. 5, State v. Bragg, 160 W.Va. 455, 235 S.E.2d 466 (1977) (addressing the argument that it was error for Court to instruct on felony murder when the indictment was returned against the defendant for first degree murder); *See also* Syl. Pt. 4, State v. Satterfield, 193 W. Va. 503, 457 S.E.2d 440, (1995) (affirming the *Bragg* holding); Syl. Pt. 1, State v. Hughes, 225 W. Va. 218, 220, 691 S.E.2d 813, 815 (2010) (holding that the State may proceed on alternative theories of premeditated murder and felony murder even when indictment does not expressly charge felony murder); Syl. Pt. 3, State ex rel. Peacher v. Sencindiver, 160 W. Va. 314, 314, 233 S.E.2d 425, 425 (1977) (noting that the State is only required to prove "that defendant committed or

attempted to commit the named felony and that he committed murder incidental thereto" in order to sustain a felony murder conviction).

Moreover, the syllabus of the Supreme Court of Appeals' *Jenkins* opinion specifically acknowledged what elements were necessary for the State to obtain a conviction for felony murder in Petitioner's case:

> [t]he elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.

Syl. Pt. 9, State v. Jenkins, 229 W. Va. 415, 420, 729 S.E.2d 250, 255 (2012) *per curiam* (citations omitted).

Based upon the foregoing, this Court finds and concludes that Petitioner's argument that the State was required to prove the elements of malice, deliberation, and willfulness in order to sustain a conviction for felony murder in Petitioner's case is unsupported by the law and without merit.

## IV.    Improper Venue And Prejudicial Pretrial Publicity

Petitioner raises the issue of improper venue in his *Losh List*, while it is clear from a review of the record that Petitioner's argument wholly relates to pretrial publicity. Petitioner essentially argues that an abundance of pretrial publicity caused him to be unable to obtain a fair trial in the Circuit Court of Fayette County, and that as a result of such pervasive pretrial publicity, venue was rendered improper in this Court.

It is well established in West Virginia that "[u]nder the Constitution and laws of this state, a crime can be prosecuted and punished only in the state and county where the alleged

-28-

offense was committed." State v. Dennis, 216 W. Va. 331, 342, 607 S.E.2d 437, 448 (2004) (citing Syl. Pt. 2, State v. McAllister, 65 W.Va. 97, 63 S.E. 758 (1909)). Since it is without question that the crime occurred in Fayette County, West Virginia, and that, absent the alleged pretrial publicity, venue was proper in the Circuit Court of Fayette County, West Virginia, the Court will resolve these issues solely as they relate to prejudicial pretrial publicity.

Also, although not raised or asserted under Petitioner's ineffective assistance of counsel contention, the Petitioner argues that his *Trial Counsel* was ineffective because *Trial Counsel* did not file for a change of venue due to prejudicial pretrial publicity. The Court will appropriately address this argument in conjunction with Petitioner's other alleged deficiencies under Petitioner's ineffective assistance of counsel contention. *See* discussion *infra*, Sect. VII, subsec. b, p. 49.

In discussing pretrial publicity, the United States Supreme Court has held that "[j]uror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged to not alone presumptively deprive the defendant of due process." Syl. Pt. 1, Murphy v. Florida, 421 U.S. 794, 794, 95 S. Ct. 2031, 2033, 44 L. Ed. 2d 589 (1975) (citations omitted). Before post-conviction relief may be granted, a petitioner must show that pretrial publicity *actually* prejudiced the jury. *See* id. at 800, 95 S. Ct. at 2036. The jurors need not be totally ignorant of the case; it is sufficient if the jurors are able to render an impartial verdict based upon the evidence rather than on any pre-conceived opinion. *See* Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961); Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).

-29-

Likewise, the West Virginia Supreme Court of Appeals adheres to the same general principles regarding a change of venue due to pretrial publicity. *See* Syl. Pts. 6, 7, 8, 9, State v. Satterfield, 193 W. Va. 503, 507, 457 S.E.2d 440, 444 (1995); Syl. Pts. 1, 2, 3, State v. Derr, 192 W. Va. 165, 167, 451 S.E.2d 731, 733 (1994); *See also* State v. Beegle, 188 W. Va. 681, 425 S.E.2d 823 (1992) (good cause for change of venue requires proof that hostile sentiment so great that the defendant cannot receive a fair trial); State v. Gangwer, 169 W. Va. 177, 286 S.E.2d 389 (1982) (proof of prejudice insufficient to warrant change of venue unless so great that the defendant cannot receive a fair trial); State v. Boyd, 167 W. Va. 385, 280 S.E.2d 669 (1981) (reiterating that the focus is not on the "amount of pre-trial publicity, but on whether the publicity has so pervaded the populace of the county as to preclude a fair trial."); State v. Pratt, 161 W. Va. 530, 244 S.E.2d 227 (1978) (summarizing cases that hold that "good cause for change of venue means proof that a defendant cannot get a fair trial in the county where the offense occurred because of the existence of extensive present hostile sentiment."). In some instances, however, the sensational and spectacular facts of a case and the sheer magnitude of pervasive prejudicial pre-trial publicity may alone warrant the reversal of a conviction. *See* State v. Sette, 161 W. Va. 384, 242 S.E.2d 464 (1978) (noting that: the facts of the case were sensational; almost fifty percent of the jurors summoned were disqualified due to pre-determined conclusion of guilt; and due to public interest, the prosecutor and law enforcement essentially tried the case in the media).

In the case at bar, the Petitioner's case was not sensational, or unlike many other cases here in this jurisdiction. *Trial Counsel* testified during the omnibus hearing that he had kept track of the pre-trial publicity in Petitioner's case and that, comparatively speaking, Petitioner's case

had received far less pre-trial news coverage than many other past cases of a similar nature. *See* OHCH Transcript, Vol. II, pp. 35-38. Also, the record of the jury selection portion of Petitioner's trial reveals that the Court and counsel conducted a thorough voir dire of the prospective jurors. *See* Trial Transcript, Vol. I, pp. 13-69. Following a synopsis of the charges against the Petitioner, the Court inquired 1) as to whether any juror had any personal knowledge of the case against the Petitioner; 2) as to whether any juror had read or heard about this case from any source whatsoever, and 3) as to whether any juror had heard the case discussed at any point in the past. *See* Trial Transcript, Vol. I, pp. 16-17. *Not a single juror answered in the affirmative to any of the foregoing questions. See* id.

Although the record reflects that the jury lacked any knowledge of Petitioner's pretrial publicity, the Petitioner argues that the prospective jurors *could* have failed to disclose information, or been untruthful, about their independent knowledge of Petitioner's case. The Petitioner, however, fails to provide this Court with even a scintilla of evidence to show that any of the jurors were, in fact, untruthful or deceitful during voir dire. Petitioner's conjecture and speculation will not be permitted to serve as the basis for the showing of prejudice outlined in *Murphy* and *Satterfield supra.*

Based upon the foregoing and a thorough review of the record, this Court finds that Petitioner's pretrial publicity was not so pervasive that it created a hostile sentiment in this community which precluded the Petitioner from receiving a fair trial. The Court also finds that the Petitioner has failed to show that he actually suffered any prejudice as a result of the pretrial publicity in his case. This Court further finds and concludes that Petitioner's contentions

-31-

regarding improper venue and prejudicial pretrial publicity are without merit and unsupported by the record.

## V.    Refusal To Allow Lesser Included Offense Of Manslaughter

Petitioner alleges that it was constitutional error for the Court not to include a lesser included offense instruction to the charge of felony murder during the commission of delivery of a controlled substance.

> 'The question of whether a defendant is entitled to an instruction on a lesser included offense involves a two-part inquiry. The first inquiry is a legal one having to do with whether the lesser offense is by virtue of its legal elements or definition included in the greater offense. The second inquiry is a factual one which involves a determination by the trial court of whether there is evidence which would tend to prove such lesser included offense.'

Syl. Pt. 9, State v. Davis, 205 W. Va. 569, 573, 519 S.E.2d 852, 856 (1999) (citing Syl. Pt. 1, State v. Jones, 174 W.Va. 700, 329 S.E.2d 65 (1985)).

The West Virginia Supreme Court case of *State v. Wade* makes it unnecessary for this Court to analyze the first prong of this inquiry. State v. Wade, 200 W. Va. 637, 490 S.E.2d 724 (1997). Like the case at bar, *Wade* involved a felony murder conviction where the underlying felony was delivery of a controlled substance. *Id.* The *Wade* Court held that, "[a]s a matter of law, second-degree murder, voluntary manslaughter, and involuntary manslaughter are not lesser included offenses of felony-murder." Syl. Pt. 4, id. at 640, 490 S.E.2d at 727.

At the omnibus hearing, *Trial Counsel's* explanation of why he had not sought an instruction for the lesser included offense of manslaughter in Petitioner's case was also consistent with the *Wade* holding. *See* OHCH Transcript, Vol. I, p. 163.

Moreover, a factual inquiry into Petitioner's case also leads this Court to find that a lesser included offense instruction would not have been warranted. The prosecution sought to prove,

-32-

by the evidence presented, that the Petitioner intentionally delivered a controlled substance to C.C.J. which ultimately resulted in the death of C.C.J. The Petitioner's defense was essentially threefold: 1) Petitioner was in no way involved with the delivery of a controlled substance to C.C.J.; 2) C.C.J. died as a result of natural preexisting medical conditions and the combined effects of both oxycodone and benzodiazepine, rather than just oxycodone; and 3) if C.C.J. died as a result of the ingestion of controlled substances, they were delivered to C.C.J. by someone other than the Petitioner.

The Petitioner's defense essentially attacked the cause of death and the underlying felony offense of delivery. If the jury chose to belief that the Petitioner had not delivered the drugs to C.C.J. or that C.C.J.'s death had not occurred as a result of Petitioner's delivery of oxycodone to C.C.J., then the result would have been acquittal; the jury could not have found the Petitioner guilty of the lesser included offense of manslaughter.

Based upon the foregoing, this Court finds and concludes that Petitioner's argument that it was constitutional error for the Court not to give an instruction on the lesser included offense of manslaughter is unsupported by the law and without merit.

## VI. Claims Of Prejudicial Statements By The Prosecutor

The Petitioner asserts in his *Amended Petition* and *Losh List* that his due process rights and Fifth Amendment right to remain silent were violated due to prejudicial statements made by the prosecutor. Essentially the Petitioner argues that his right to a fair trial was violated because the prosecutor allegedly referenced Petitioner's statement which the Court had previously ruled inadmissible during the State's case in chief.

It has long been established in West Virginia that

-33-

> [a]n attorney for the state may prosecute vigorously as long as he deals fairly with the accused; but he should not become a partisan, intent only on conviction. And, it is a flagrant abuse of his position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom.

Syl. Pt. 2, State v. Critzer, 167 W. Va. 655, 655, 280 S.E.2d 288, 289 (1981) (citing Syllabus, State v. Moose, 110 W.Va. 476, 158 S.E. 715 (1931)). "It is improper for a prosecutor in this State to '(A)ssert his personal opinion as to the justness of a cause, as to the credibility of a witness ... or as to the guilt or innocence of the accused ....'" Syl. Pt. 3, id., (quoting ABA Code DR7-106(C) (4) in part). Even more recently, the West Virginia Supreme Court of Appeals has reaffirmed that "[a] prosecutor may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct [however] for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." Syl. Pt. 7, State v. England, 180 W. Va. 342, 345, 376 S.E.2d 548, 551 (1988) (alterations from original).

"A judgment of conviction will be reversed because of improper remarks made by a prosecuting attorney to a jury that clearly prejudice the accused or result in manifest injustice." State v. Stephens, 206 W. Va. 420, 425, 525 S.E.2d 301, 306 (1999) (citing Syl. Pt. 5, State v. Ocheltree, 170 W.Va. 68, 289 S.E.2d 742 (1982)). The West Virginia Supreme Court of Appeals has established that four factors are to be taken into consideration when determining whether prosecutorial remarks rise to a level requiring reversal of a conviction:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pt. 8, State ex rel. Kitchen v. Painter, 226 W. Va. 278, 294-95, 700 S.E.2d 489, 505 (2010) (citing Syl. Pt. 6, State v. Sugg, 193 W.Va. 388, 456 S.E.2d 469 (1995)).

-34-

In the case at bar, the trial record reveals that the prosecutor's comments, to which the Petitioner refers, were first made during the questioning of State's witness, Detective James Sizemore, and again on rebuttal during closing arguments.

The following is the relevant testimonial portion, taken during redirect examination, of the first instance where the Petitioner alleges the prosecutor made an unconstitutional reference to the suppressed statement of the Petitioner:

Q:     Detective Sizemore, if I could ask you to recall the original question about your belief or your opinion, if you will, as to the proof that Mr. Jenkins actually delivered these drugs to his son, and I believe you wanted to answer the question more fully but didn't get the opportunity. So I would ask you, if you'd like to, you may explain yourself and your reasoning.

A:     Unlike a lot of drug cases, we don't have a video of a controlled purchase in this case. *[C.C.J.] is dead, and he can't tell us who gave him the drugs.*

But all - - all - - of the circumstantial evidence that we've gathered in this case - - the Holly Burdette statement, the phone conversations between Henry Jenkins and Naomi Lucas Griffith, the statement from Josh Settle, statements from Marshall Walker and Shaun Stark, the autopsy findings from Dr. Sabet and Dr. Kraner - - everything that we've gathered is consistent.

There's some minor discrepancies here and there on facts that may not mean anything, but there's no question [C.C.J.] had oxycodone and Valium in his system. Henry Jenkins obtained oxycodone from Josh Settle. And those drugs were a contributing factor towards this child's death.

Q:     *And isn't it true, Detective, that in at least two of the phone calls that we all heard, this man indicated he gave drugs to his son, confessed it? Is that true?*

A:     Yes, sir.

Q:     *So when I ask you to refer back to* your police report, Page 11, and this sort of summarizes everything in the police report, *when you said, "Given the absence of a truthful statement by Henry Jenkins, there's no way to prove beyond a reasonable doubt, " so on and so forth, in fact, we have, we would assume, a truthful statement from Henry Jenkins, don't we?*

A:     *In essence, yes, sir.*

-35-

Q:          That's all I have, your Honor. Thank you.

Trial Transcript, Vol. II, pp. 174-175 (*emphasis added*).

Next, the Petitioner alleges that the Prosecutor again made improper prejudicial

comments during the following relevant portion of the closing argument:

> Now, I want to talk to you about, finally, the last thing I - - before I move on, I want to talk to you about this possession business and this delivery business. Okay?

> And, you know, I've got to tell you, sometimes Jim Sizemore just aggravates the heck out of me because, in a profession, in a career where people do a lot of talking about what they think should say and not what really happened, Jim Sizemore is a bit of an oddity.

> I've seen many cases where I don't think the defense lawyer had a clue what to do, and Jim Sizemore said, "I see this as a weakness in the case." And, lo and behold, here I am sitting with a daggone defense lawyer arguing about something that Jim Sizemore told them. Frustrating to me.

> But am I here to win? No. I'm here to make sure that truth comes forward and justice comes out of it. *And when Jim Sizemore said, "I cannot tell you, short of a statement from the defendant, Mr. Jenkins, beyond a shadow of a doubt" or what have you "that a delivery occurred," well, that's true, isn't it?* Because, you know, in the mob there's a saying, *"Two people can keep a secret if one of them's dead." How are you ever going to prove that when the recipient died?*

Trial Transcript, Vol. III, pp. 103-104.

Based upon the entire context in which the alleged prejudicial comments were made, it is

clear to this Court that in the first instance the prosecutor was in no way referring to the

Petitioner's previously suppressed statement, but, was instead referring to the previous phone

conversations wherein the Petitioner discussed the circumstances surrounding the death of C.C.J.

The Court finds that this line of questioning was in direct response to an issue raised by *Trial*

*Counsel* during the cross examination of Detective Sizemore regarding a portion of Detective

-36-

Sizemore's investigative report that noted that "[g]iven the absence of a truthful statement by Henry Jenkins there is no way to prove beyond a reasonable doubt that Henry Jenkins actually administered either diazepam or oxycodone to the decedent?" *See* Trial Transcript, Vol. II, pp. 162-163.

In regards to the second instance raised by the Petitioner, it is also clear to this Court that the prosecutor was not referring to the Petitioner's statement, or lack thereof, but instead was referring back to that portion of testimonial evidence referenced in the first instance. These comments could only be viewed as referring to Petitioner's previously suppressed statement, or lack of a statement by the Petitioner, if, like the Petitioner, someone elects to take the comments and questions completely out of context.

Based upon the foregoing, and a thorough review of those relevant portions of the trial transcript, this Court finds that the Petitioner has misconstrued the prosecutor's comments and taken them wholly out of context. This Court also finds that the comments, upon which Petitioner's contention is based, are not improper prejudicial comments.

Even if this Court assumes, arguendo, that the prosecutor's comments were improper, Petitioner's contention still fails under a *Sugg* analysis. *See* Syl. Pt. 6, State v. Sugg, 193 W.Va. 388, 456 S.E.2d 469 (1995). Applying the *Sugg* factors to the circumstances and surrounding facts, this Court remains unconvinced that the Petitioner was clearly prejudiced by the prosecutor's comments, or that manifest injustice occurred during Petitioner's trial. First, this Court finds it highly unlikely that the jury was misled by the alleged prejudicial comments when those comments are considered in context with the surrounding facts and questioning. Second, the alleged prejudicial comments were extremely isolated, only occurring once during the State's

-37-

case in chief and once during the rebuttal portion of the State's closing argument. Lastly, as it is clear that the comments were referring to phone conversations that had previously been played to the jury and to prior testimonial evidence regarding these phone calls, this Court finds that the comments were clearly not being used to divert the jury's attention to any extraneous matter and the strength of competent evidence against the Petitioner remained unaffected.

Moreover, this Court is of the opinion that, under the factual scenario presented by the Petitioner, Petitioner's state or federal constitutional rights are not even implicated as a result of the prosecutor's alleged prejudicial comments. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." State ex rel. Wimmer v. Trent, 199 W. Va. 644, 648, 487 S.E.2d 302, 306 (1997) (citing Syl. Pt. 4, State ex rel. McMannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979)). Even if the prosecutor's comments were improper, they would constitute ordinary trial error, which does not rise to the level implicating state or federal constitutional rights. *See generally* id.

Based upon all of the foregoing, this Court finds and concludes that Petitioner's assertion that relief is warranted in this habeas proceeding because his state and federal constitutional rights were violated as a result of improper prejudicial comments made by the prosecutor, is frivolous, unsupported by the record, and without merit.

## VII.    Ineffective Assistance Of Trial Counsel

Petitioner asserts that his *Trial Counsel* failed to provide him with competent and effective assistance of counsel as contemplated by both the West Virginia Constitution and the United States Constitution. Specifically, the Petitioner alleges that his *Trial Counsel* was ineffective because *Trial Counsel* allegedly a) Failed to object to inappropriate prejudicial

-38-

comments of the prosecution; **b)** Failed to file a motion for change of venue due to pretrial publicity; **c)** Told the jury there was proof of delivery; **d)** Refused to subpoena witnesses necessary for trial; **e)** Failed to disclose or call any expert witnesses; **f)** Failed to have an authenticating witness; **g)** Failed to establish when blood was drawn; **h)** Failed to object to lay witness' opinion on legal weight of evidence; **i)** Failed to object and seek curative instruction over inappropriate bolstering of other witnesses' credibility; **j)** Failed to object to extensive leading questions; **k)** Failed to object to substantive testimony over exhibits marked for identification only; and **l)** Failed to object and seek a curative instruction over lay witnesses testifying as experts. The Court notes that many of Petitioner's arguments are based upon *Counsel* allegedly being ineffective for not putting forth an objection at various times during Petitioner's trial. In the interest of brevity, the Court will combine and collectively analyze those allegations of ineffective assistance that may be addressed under the same relevant law.

The Supreme Court of Appeals has stated, "[o]ur law is clear in recognizing that the Sixth Amendment of the federal constitution and Article III, § 14 of the state constitution guarantee not only the assistance of counsel in a criminal proceeding but that a defendant has the right to effective assistance of counsel." Ballard v. Ferguson, 232 W. Va. 196, 751 S.E.2d 716, 720 (2013) (citing Cole v. White, 180 W. Va. 393, 395, 376 S.E.2d 599, 601 (1988)). "A charge of ineffective assistance of counsel is not one to be made lightly. It is a serious charge which calls into question the integrity, ability and competence of a member of the bar." State ex rel. Daniel v. Legursky, 195 W. Va. 314, 319, 465 S.E.2d 416, 421 (1995). "Unless claims of ineffective assistance of counsel have substantial merit, [the] Court, historically, has taken a negative view toward the assertion of frivolous claims." Id.

-39-

"In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, State v. Miller, 194 W. Va. 3, 6, 459 S.E.2d 114, 117 (1995). "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syl. Pt. 6, id. at 6-7, 459 S.E.2d at 117-118. Likewise, in evaluating whether *Counsel's* conduct was professionally acceptable, this Court will assess *Counsel's* actions according to what was known and reasonable at the time, rather than using hindsight to second guess *Counsel's* decisions and potentially "elevate a possible mistake into a deficiency of constitutional proportion". Syl. Pt. 4, State ex rel. Daniel v. Legursky, 195 W. Va. at 317, 465 S.E.2d at 419; *see also* State ex rel. Edgell v. Painter, 206 W. Va. 168, 172, 522 S.E.2d 636, 640 (1999).

Cases where relief is warranted in habeas corpus based upon allegations of ineffective assistance of counsel are rare. *See* State v. Miller, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995). This is intentionally so as it flows from the long developed policies of the West Virginia Supreme Court of Appeals and the United States Supreme Court in mandating great deference to

-40-

counsel's strategic decisions and prohibiting rigid standards of acceptable service. Id. As the

*Miller* Court further explained,

> [i]n other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most *good* lawyers would have done. We only ask whether a *reasonable* lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

194 W. Va. at 16, 459 S.E. 2d at 127 (*emphasis added*).

Counsel's decisions, however, must be based upon an adequate investigation. *See* State

ex rel. Daniel v. Legursky, 195 W. Va. 314, 465 S.E.2d 416 (1995). As recognized by the

*Legursky* Court,

> [t]he fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about how best to represent criminal clients. Thus, the presumption is simply inappropriate if counsel's strategic decisions are made after an inadequate investigation.

Syl. Pt. 3, id. at 317, 465 S.E.2d at 419.

The Court has thoroughly reviewed the record in this matter and considered the

arguments of counsel and the evidence presented at the omnibus hearing in relation to the

contentions under Petitioner's ineffective assistance of counsel claim, as well as the two

contentions that the Petitioner argued, both as an independent ground and in terms of the

effectiveness of his counsel. Pursuant to the guidance offered in *Legursky*, the Court may deem it

-41-

unnecessary to address the Petitioner's contentions under both prongs of the *Strickland/Miller* test; the Court may choose to conduct analysis only under the prong that the contention fails to meet. State ex rel. Daniel v. Legursky, 195 W. Va. at 321, 465 S.E.2d at 423 (stating a court "need not address both prongs . . . but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.").

With the foregoing guidance in mind, this Court will now proceed to address Petitioner's ineffective assistance of counsel contentions.

### a. *Failure to object to inappropriate prejudicial comments of the prosecution*

Petitioner asserts that his *Counsel's* performance was deficient because *Counsel* did not object to inappropriate prejudicial comments made by the prosecution. The Petitioner raised this issue in his *Amended Petition* both as an independent ground for relief and under his ineffective assistance of counsel claim. *See* Sect. VI, *supra*, p. 33. The difference, however, is that the Petitioner put forth as an independent ground for relief only one instance where the prosecutor allegedly made an improper prejudicial comment, while alleging three instances under his ineffective assistance of counsel claim. Under Petitioner's ineffective assistance of counsel claim, the Petitioner specifically argues that his *Counsel* should have objected when the prosecutor allegedly did the following during his closing argument: 1) made the comment "short of a statement from the defendant, Mr. Jenkins"; 2) stated that he would not have brought the case to the grand jury on the testimony of Holly Burdette; and 3) stated that when there was a "special needs child, you have to be a special parent. The standard is higher for that person." *See Amended Petition*, Sect. 3, subsec. c, p. 17.

As this Court discussed *supra*,

> [a]n attorney for the state may prosecute vigorously as long as he deals fairly with the accused; but he should not become a partisan, intent only on conviction. And, it is a flagrant abuse of his position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom.

Syl. Pt. 2, State v. Critzer, 167 W. Va. at 655, 280 S.E.2d at 289 (citing Syllabus, State v. Moose, 110 W.Va. 476, 158 S.E. 715 (1931)). "It is improper for a prosecutor in this State to '(A)ssert his personal opinion as to the justness of a cause, as to the credibility of a witness ... or as to the guilt or innocence of the accused ....'" Syl. Pt. 3, id., (quoting ABA Code DR7-106(C) (4) in part). Further, "[a] prosecutor may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct [however] for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw." Syl. Pt. 7, State v. England, 180 W. Va. at 345, 376 S.E.2d at 551 (alterations from original).

"A judgment of conviction will be reversed because of improper remarks made by a prosecuting attorney to a jury that clearly prejudice the accused or result in manifest injustice." State v. Stephens, 206 W. Va. at 425, 525 S.E.2d at 306 (citing Syl. Pt. 5, State v. Ocheltree, 170 W.Va. 68, 289 S.E.2d 742 (1982)). The West Virginia Supreme Court of Appeals has established that four factors are to be taken into consideration when determining whether prosecutorial remarks rise to a level requiring reversal of a conviction:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pt. 8, State ex rel. Kitchen v. Painter, 226 W. Va. at 294-95, 700 S.E.2d at 505 (citing Syl. Pt. 6, State v. Sugg, 193 W.Va. 388, 456 S.E.2d 469 (1995)).

-43-

The Court will now in turn address each instance where the Petitioner alleges the prosecutor made an inappropriate prejudicial comment.

### 1) The prosecutor commenting that "short of a statement from the defendant, Mr. Jenkins"

The Court previously found *supra* that the statement, to which the Petitioner refers in this first instance, was taken out of context and was not an improper prejudicial comment by the prosecutor. *See* discussion *supra*, pp. 34-39. As the prosecutor's comment was not improper or prejudicial, the Court finds and concludes that, under the first prong of *Strickland/Miller*, *Counsel* not objecting to the comment of the prosecutor did not amount to deficient performance.

### 2) The prosecutor commenting that he would not have brought the case to the grand jury on the testimony of Holly Burdette

The Petitioner argues that his *Counsel* provided ineffective assistance because *Counsel* did not object when the prosecutor allegedly commented that he would not have brought the case to the grand jury on the testimony of Holly Burdette.

The following is the relevant portion of the prosecutor's rebuttal closing argument that contains the prosecutor's comment upon which Petitioner's argument is based:

Prosecutor:     I would not have brought this case to you based solely on the testimony of Holly Burdette. Detective Sizemore told you he wouldn't have brought this case to a grand jury and to you on the testimony of Holly Burdette. But do you feel like the State has? Because the State hasn't. Because what the State did was, it got Holly's information, and then it went about the business of trying to see if we could prove it, trying to see if we could corroborate it, trying to see if we could match up what she told us with other people.

Well, what did she tell us? She said, "Well, we went down Route 61, and Henry traded Jeff Gordon stuff for three pills." Well, lo and behold, everybody knows - - everybody said they went down 61.

We found the drug dealer. He said, "Yeah, I gave Henry three pills, and I got Jeff Gordon stuff." Check. Right?

-44-

"What was the dosage on them?" "Thirty milligrams." Wow, that's a heck of a coincidence, isn't it? Considering Holly and Josh were interviewed at separate times, and there's no proof they knew each other; right? And then also they just happened to be the same brand name. What a daggone coincidence; right? And then, lo and behold, what do we happen to find in Christian's blood? Oxycodone.

So are we really relying on Holly Burdette's testimony? No. It's just one piece of the puzzle, a piece that is duplicated by Josh Settle's testimony; is corroborated, I'd argue, by Marshall Walker's testimony, by Shawn Stark's testimony, and corroborated by the defendant's own statements to his wife or girlfriend or baby mama, whatever she is, on the phone about what type of drug it was and what dosage it was.

The Court:     Twenty-three minutes, Mr. Parsons.

Prosecutor:     Thank you.

At a certain point, ladies and gentlemen, coincidences are ruled out and they become facts.

Trial Transcipt, Vol. III, pp. 84-86.

Initially, contrary to Petitioner's assertion, the Court finds that the prosecutor did not say that he would not have brought the case to the grand jury on the testimony of Holly Burdette. Rather, contrary to Petitioner's assertion, the prosecutor said, "I would not have brought this case to *you* [the jury] based *solely* on the testimony of Holly Burdette." *See* Trial Transcipt, Vol. III, pp. 84 (*emphasis added*). Moreover, the prosecutor did not in any way refer to any testimony or evidence that may have, or may not have, been presented to the grand jury.

The Court also finds that the actual comment was directly related to testimony that was previously offered by Detective James Sizemore, both on direct and cross examination, concerning the course of his investigation, the role Holly Burdette played in that investigation, and the steps Detective Sizemore took in corroborating the testimony of Ms. Burdette before

-45-

initiating the criminal action against the Petitioner. *See* Trial Transcript, Vol. II, pp. 156-159; *see also* Trial Transcript, Vol. II, pp. 161-163, 166-173.

Further, in reviewing the record, considerably more light is shed upon the comment at issue when it is taken in context with its surrounding text. There was significant trial testimony establishing that many, if not most, of the witnesses, and the Petitioner, were known illegal drug users. The prosecution, and the defense alike, had to both exploit, and overcome, the negative aspects of this established fact. An example of this can be seen when, during closing argument, *Co-Counsel* stated,

> "Holly comes back, 'Oh, well, [C.C.J.] was itching.' Well, where was he itching?' 'Oh, he was itching his shoulder, he was itching his back, he had leaned down here and he was all' - - *'Twitchy like you are today, Holly?'* 'Yeah, kind of' - - no, I didn't ask that. I'm sorry. Okay."

Trial Transcript, Vol. III, p. 93 (*emphasis added*). Immediately preceding the comment at issue, the prosecutor attempted to negate this negative inference by reiterating the established fact of Holly Burdette's known illegal drug usage by stating, "[i] want to talk about Holly Burdette. Okay? Holly Burdette's a pill head. I told you she was a pill head. She looked like a pill head. Okay?" Trial Transcript, Vol. III, pp. 83-84.

This Court is of the opinion that the prosecutor's actual comment was in compliance with the restrictions of *Critzer* supra, as the prosecutor did not "refer to any material facts outside the record, or not fairly deducible therefrom ." 167 W. Va. at 655, 280 S.E.2d at 289.

Based upon the foregoing, this Court finds and concludes that the prosecutor's actual comment that he would not have brought Petitioner's case to the jury based solely on the testimony of Holly Burdette, is not an improper prejudicial comment. As the prosecutor's comment was not improper or prejudicial, the Court finds and concludes that, under the first .

-46-

prong of *Strickland/Miller*, *Counsel* not objecting to the comment of the prosecutor did not amount to deficient performance.

### 3) Prosecutor's comment that when there was a "special needs child, you have to be a special parent. The standard is higher for that person."

The Petitioner argues that his *Counsel* was ineffective because *Counsel* did not object when the prosecutor allegedly made a comment regarding when there was a "special needs child, you have to be a special parent. The standard is higher for that person."

The following is the relevant portion of the prosecutor's rebuttal closing argument that contains the prosecutor's comment upon which Petitioner's argument is based:

Prosecutor:      And, ladies and gentlemen, you heard his own words in speaking to his wife, girlfriend, the mother of his child. And, yes, this child didn't have the same opportunities I had. This child didn't have the same opportunities that any of you had. Because of his illness, because of his parents, because of his station in life.

*And if you listen to the defense lawyers*, well, you know, *we just ought to hold them to a lower standard, shouldn't we?* Well, just because, you know, you've got a drug habit and because, you know, your - - you had a kid too young, well, fine. You know, Brian Parsons, that's just reality. You've got to accept it. *The standard's just lower.*

*Well, I argue against that, ladies and gentlemen. And I tell you, when you have a special needs child, you have to be a special parent. The standard is higher for that person.* And if you can't do it, then get out of the way and let someone who can do it take care of this kid because there are people all over this world who don't have a precious child like [C.C.J.] and know what to do with it when they have a child like that.

Trial Transcript, Vol. III, pp. 109-110 (*emphasis added*).

Once again, the Petitioner has taken a small excerpt from the transcript out of context and attempted to develop an error of constitutional proportions from it.

-47-

Based upon a thorough reading of the relevant portions of the record, this Court finds that, contrary to Petitioner's assertion, the prosecutor was not in any way arguing that a different *legal* standard applied to the Petitioner. Rather the prosecutor was arguing that unlike a normal, healthy child, a child with a chronic health condition requires a parent to be attuned to the special health needs of that child.

It is also clear to this Court that the prosecutor did not haphazardly make the comment, but was instead arguing against a point previously raised during *Co-Counsel's* closing argument. Petitioner's *Co-Counsel* made the following argument during her closing argument:

*Co-Counsel*: From the time [C.C.J.] was born, he had health problems. He had cystic fibrosis. And I'll be quite candid with you. *What I see in my job often is that kids who need the best parents sometimes are the kids that are born to the parents who have their own problems.*

And I would tell you that that's what happened with [C.C.J.]. You know [C.C.J.] was born to a young mother who was addicted to crack and liked to drink and a father who abused pills, pharmaceuticals, pills. I usually say "pills," because I don't know how to spell "pharmaceuticals." But it's the same thing. Pills.

We have in no way suggested that Henry Jenkins didn't abuse pills. *And unfortunately, in this case, you have to understand the realities of how this boy grew up, what he was exposed to.* Some of you are fairly young, and you probably didn't learn about drug addiction, drug use, 30's, snorting from your parents. I hope you didn't. Okay? But, unfortunately [C.C.J.] did.

There was a time when [C.C.J.] would live with Henry. There were times when [C.C.J.] would live with Annie. There were times he would stay with his grandparents. And what do we know from Annie? We know that, when he was around 13 and staying with her, she knows he was starting to smoke marijuana, smoke weed. Okay? Are we shocked?

I mean, my mother directed the church choir, and guess what? I started singing in a church choir. You know? Mr. Stanton's parents are both lawyers. Guess what? He grew up to be a lawyer. So are we really shocked that, when he started his teenage years, that [C.C.J.] would use controlled substances?

-48-

Trial Transcript, Vol. III, pp. 88-89 (*emphasis added*).

Considering *Co-Counsel's* argument, the prosecutor's argument, and the context in which the comment was made, the Court finds it highly unlikely that the jury perceived the prosecutor's comment to mean that a different *legal standard* applied to the Petitioner.

Based upon all of the foregoing, this Court finds and concludes that the prosecutor's comment regarding a higher standard for the parent of a special needs child was not improper or prejudicial. As the prosecutor's comment was not improper or prejudicial, the Court finds and concludes that, under the first prong of *Strickland/Miller*, *Counsel* not objecting to the comment of the prosecutor did not amount to deficient performance.

### b. *Failure to file a motion for a change of venue due to pretrial publicity*

Petitioner argues the issue of change of venue due to pretrial publicity as an independent ground for relief and, although not specifically alleged in the *Amended Petition*, the Petitioner also elicited extensive testimony in regards to the proficiency of *Counsel's* performance in not filing a motion for a change of venue due to said pretrial publicity. *See* discussion, Section IV, *supra*; *Compare Amended Petition with* OHCH Transcript, pp. 160-162 and OHCH Transcript, Vol. II, pp. 7-13, 45-50. For this reason and in the interest of thoroughness, the Court will also address this issue as a contention under Petitioner's ineffective assistance of counsel claim.

As previously discussed by this Court, *Trial Counsel* testified that he had kept track of the Petitioner's pretrial publicity and that, in his view, it was not overly pervasive. *See* discussion, Section IV, *supra*, p. 31. *Trial Counsel* testified that he felt, based upon his experience and the level of pretrial coverage in Petitioner's trial, that a change of venue was not warranted. *See* OHCH Transcript, Vol. II, pp. 35-38. *Trial Counsel* also testified that he could

recall discussing a change of venue with the Petitioner, on more than one occasion, and that he had explained to the Petitioner why *Trial Counsel* felt a change of venue was not warranted. *See* id, pp. 37-38.

The Petitioner, however, testified during the omnibus habeas corpus evidentiary hearing that his *Counsel* basically ignored Petitioner's multiple requests for *Counsel* to file a motion for a change of venue. *See* OHCH Transcript, Vol. II, pp. 11-13. This Court seriously questions the veracity of Petitioner's testimony in this regard as the trial transcript clearly reflects that, at the time of trial, Petitioner did not have any complaints regarding the manner *Counsel* had handled Petitioner's case up to that point. *Compare* OHCH Transcript, Vol. II, pp. 11-13, *with* Trial Transcript, Vol. III, p. 4.

Regardless of whether Petitioner's testimony was truthful, as this Court found *supra*, the Petitioner's pretrial publicity was not so pervasive that it created hostile sentiment in the community and the Petitioner did not suffer any prejudice as a result of the pretrial publicity in his case. *See* discussion, Section IV, *supra*, pp. 29-32. *Counsel's* performance cannot be viewed as deficient just because a motion was not filed which, under the circumstances, was unwarranted. *Trial Counsel's* evaluation of the pretrial publicity was in fact correct, as not even a single prospective juror indicated during voir dire that they had gained any knowledge of Petitioner's case from pretrial publicity. *See* Trial Transcript, Vol. I, pp. 16-17.

Based upon the foregoing, this Court finds and concludes that Petitioner's assertion that his *Counsel* was ineffective because they failed to file a motion for a change of venue based upon pretrial publicity, is without merit, as the Petitioner has failed to establish either prong of *Strickland/Miller*.

### c. *Telling the jury there was proof of delivery*

The Petitioner alleges that *Trial Counsel* was ineffective because he told the jury in his opening statement that there was proof of a delivery of controlled substances. Petitioner argues that, since this was an element of the crime Petitioner was charged with, *Trial Counsel* was ineffective because he essentially admitted that the Petitioner had, in fact, delivered the oxycodone to C.C.J.

The following is the *entire* relevant portion of *Trial Counsel's* opening statement:

> Now, on the night in question, the evidence is going to be that Henry Jenkins and [C.C.J.] - - and there are a number of other people in the trailer, and a couple of them went over to the house of Mr. Josh Settle. And Mr. Parsons told you about Mr. Settle. And they went to Mr. Settle's house, and they purchased three pills.

> And I'm like Mr. Parsons. I'm not a pharmacist. Oxycodone, roxycodone, roxicontin, Oxycontin. Basically, what it's going to come down to in your system is it's either metabolized as oxycodone or oxymorphone. And what I am to you-all is dangerous. I'm a lawyer with no clue what I'm talking about when it comes to pharmacy and I've got access to the internet. So I'm just doing the best I can here.

> *They got three pills from Josh Settle.* Now, as Mr. Parsons said, what the State needs to prove here today to prove felony murder is that there was a delivery of a drug, a giving, a transfer of this drug to this young man so this young man had access to it.

> *Well, there is proof of that. Josh Settle took a drug with [C.C.J.] in the room, knowing it would be there in his presence, and handed that drug over to Henry Jenkins.* Is Josh Settle guilty? No. The evidence is going to be Josh Settle has cut a deal, and he's got what we call immunity. He's not going to be charged with nothing.

> *Now, there's a deal. There's a transfer. But Josh Settle? No. No. no. There's nothing there. We're not going to do anything with Josh. You'll hear him testify today, and he'll walk out of here.*

> The State also has to prove, besides the transfer, that this drug was - - the oxycodone; we'll just call it that to make it simple - - is what led to the death of [C.C.J.].

-51-

Now, there were a number of people in the trailer that evening, and you're going to get to hear evidence and testimony from everyone who was there. Now, you may not think it's a pretty sight. You may not think a bunch of adults sitting and drinking and taking pills with kids coming in and out of the house is good or attractive or pretty, but that's reality. That's what happened here.

But you all have taken an oath to follow the law. *And the law is that the State has to prove there was a transfer. And the evidence from every single witness who was there that night is going to be, "I did not see Henry Jenkins give [C.C.J.] any drugs on the evening of November the 14ᵗʰ or the early morning hours of November 15ᵗʰ."* That's the evidence that you're going to hear.

Trial Transcript, Vol. I, pp. 94-96 (*emphasis added*).

Once again the Petitioner has taken a small excerpt from the transcript completely out of context. Based upon a thorough reading of the preceding relevant portion of the trial transcript, this Court finds that *Trial Counsel's* statement that there was proof of delivery of a controlled substance has been misconstrued by the Petitioner.

*Trial Counsel* testified during the omnibus hearing that, in Petitioner's trial, there wasn't any way to avoid the fact that there was considerable evidence of a "delivery" or a "transfer" from Josh Settle to the Petitioner, but that in his opinion, the best approach to minimize the negative effect of this evidence was to bring it out in the opening statement. *See* OHCH Transcript, pp.102-107. Although *Trial Counsel* did state during his opening statement that there was proof of a delivery, a full reading of the surrounding text makes it clear to this Court that *Trial Counsel's* tactical strategy was to impress upon the jury that there was proof of a delivery of controlled substances by someone other than the Petitioner. Following the statement, *Trial Counsel* placed particular emphasis on State's witness, Josh Settle, as the person who had actually delivered controlled substances on the date preceding C.C.J.'s death, but that now, in cooperation with the prosecutor, Mr. Settle was not facing any charges as a key State's witness

-52-

presenting evidence against the Petitioner. Later, *Trial Counsel's* trial strategy becomes even more evident where the record reveals that counsel impressed upon the jury that there *wasn't any* direct evidence whatsoever that, on the night in question, the Petitioner delivered the controlled substances to C.C.J. *See* Trial Transcript, Vol. I, p. 96   This is also consistent with the testimony offered by *Trial Counsel* at the omnibus hearing. *See* OHCH Transcript, pp. 106-107.

Further, during the trial, the testimony elicited from various witnesses more clearly reveals that *Counsel's* defense theory was that someone other than the Petitioner had delivered the controlled substances to C.C.J. or that C.C.J. had obtained the controlled substances on his own accord by means other than delivery by the Petitioner. This questioning was not inconsistent with the tactical approach *Trial Counsel* took during his opening statement. *See* Trial Transcript, Vol. II, pp. 97-103, 136-139; *See also* Trial Transcript, Vol. III, pp. 91-95.

As such, this Court finds that the course of action taken by *Trial Counsel* was, in fact, part of *Counsel's* strategic plan to minimize the negative effect of the evidence of a "delivery" to the Petitioner from Mr. Settle and alternatively direct culpability *away* from the Petitioner. The Court also finds that *Trial Counsel's* statement, when taken in context, was in no way an admission that the Petitioner had delivered the oxycodone to C.C.J.

"Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 21, State v. Thomas, 157 W. Va. 640, 643, 203 S.E.2d 445, 449 (1974).

-53-

Perhaps *Trial Counsel* could have articulated his point better, but this Court is not interested in grading *Trial Counsel's* performance. *See Miller*, 194 W. Va. at 16, 459 S.E. 2d at 127. The Court is only concerned with "whether a reasonable lawyer would have acted, under the circumstances, as [*Trial Counsel*] acted in the case at issue." *See* Syl. Pt. 6, id. at 6-7, 459 S.E.2d at 117-118. Under the facts and circumstances presented in this case, this Court is unable to find that a reasonable lawyer would not have likewise argued the issue of the "delivery" in the same manner as *Trial Counsel*.

Based upon the foregoing, this Court finds and concludes that Petitioner's contention that *Trial Counsel* was ineffective for indicating to the jury that there was proof of a delivery is without merit as the Petitioner has failed to establish that *Trial Counsel's* performance was deficient under the first prong of *Strickland/Miller*.

### d. *Refusal to subpoena witnesses necessary for trial*

Petitioner alleges in his *Amended Petition* that his *Counsel* provided ineffective assistance in that *Counsel* allegedly refused to subpoena certain character witnesses necessary for his trial. Petitioner argues that his character was under attack and that *Counsel* should have called these additional character witnesses to testify as to how well he cared for C.C.J.

The West Virginia Supreme Court of Appeals in *State v. Miller* acknowledged that

> [w]hat defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess. Obviously, lawyers always can disagree as to what defense is worthy of pursuing such is the stuff out of which trials are made.

State v. Miller, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995) (citing Solomon v. Kemp, 735 F.2d 395, 404 (11th Cir.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)); *see also* State ex rel. Kitchen v. Painter, 226 W. Va. 278, 290, 700 S.E.2d 489, 501

-54-

(2010) (citing <u>Goodson v. United States</u>, 564 F.2d 1071, 1072 (1977) for the proposition that counsel's decision not to interview or call witnesses is a tactical decision). "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." <u>State v. Cooper</u>, 172 W. Va. 266, 270, 304 S.E.2d 851, 854 (1983) (citing Syl. Pt. 21, <u>State v. Thomas</u>, 157 W.Va. 640, 203 S.E.2d 445 (1974).

At the omnibus hearing, the Petitioner testified that prior to trial, and during trial, he had specifically requested *Counsel* to subpoena and call various friends and family members as character witnesses to testify as to how well he had cared for C.C.J. but *Counsel* refused. *See* OHCH Transcript, Vol. II, pp. 13-16; *see also* OHCH Transcript, Vol. II, pp. 20-21. The Petitioner concedes, however, that four witnesses were noticed by *Counsel*, but argues that there were additional necessary character witnesses that were not noticed or called to testify. *See Amended Petition*, Sect. 8, p. 32. Petitioner further testified that his character was attacked during trial and that none of these "additional" witnesses were called to testify, even after Petitioner raised the issue with his *Counsel* during Petitioner's trial. *See* OHCH Transcript, Vol. II, pp. 15-16.

· *Trial Counsel* offered the following testimony at the omnibus hearing:

Q:     The final thing I want to ask you about is the issue of calling character witnesses. Do you recall this being discussed?

A:     I do. And in - - and I'm looking back on the testimony and some of Mr. Fast's questions to me last week. The issue of character was about the issue of how Mr. Jenkins cared for [C.C.J.].

Q:     His parenting.

A:            His parenting, in general. And we did discuss calling character witnesses about that. Character witnesses, as I know both lawyers know, are always a double-edged sword.

By bringing in - - because I don't think there was any question that Mr. Jenkins loved Christian and really did a pretty good job overall of caring for him.

However, - - and one of the people that said that during the trial and told me that when I went to see her at Laken was Ms. Griffith. And she made some mention of - - in her testimony of how Henry loved Christian or treated him well or something along those lines.

However, in light of the evidence that he did on several occasions, the 404B evidence, allow him to ingest an [sic] illegal substances and, once we open up character of any kind or nature, - - Mr. Jenkins does have a criminal record - - I think that we would have been risking opening up the floodgates to allow his criminal record to come in, to allow more evidence that I think the Court would have excluded under 404B, but I think the Court may have allowed under character. I think it would have been a mistake to call witnesses to that effect.

Q:            Did you have those conversations with Mr. Jenkins?

A:            Yes, we did.

Q:            Did he agree with you at the time?

A:            To the best of my recollection, yes. That was something we did discuss. I discussed it with his mother, as well.

Q:            And I believe I asked you this on cross when you testified before, but I just want to make sure. On the day of trial and the days that followed, was there ever a time when Mr. Jenkins said, "Hey, I just don't agree with how you guys are doing this, I'm not happy," any sort of breakdown of the attorney/client relationship or did things appear to you to be cooperative and smooth between everyone involved?

A:            I thought everything was cooperative and smooth.

*See* OHCH Transcript, Vol. II, pp. 38-40.

On cross examination, *Trial Counsel* offered the following additional testimony:

Q:            Mr. Stanton, besides - - obviously, Mr. Jenkins did not, as you say, - - well, your testimony was that he didn't give you a written list.

-56-

Did he discuss names of people - - aunts, uncles, relatives - - and say, "They can come here and say I took care of my son, I took him to doctor appointments, I took him to school functions and I did his daily breathing treatments"? Did Mr. Jenkins bring that information to you?

A:		He did bring us the names of family members who he felt would testify to that effect, yes.

Q:		Now, when you got to trial, were any of those people subpoenaed by the defense?

A:		No.

Q:		And why not?

A:		For two reasons. One, we did have Ms. Flint who could address the issue; two, we had a hostile witness, Ms. Griffith, who also could address the issue and do so in a way - - with the State saying, "Well, here's where he failed to do well," Ms. Griffith could say overall, "Well, yes, he clearly loved his child and at other times did okay."

		And the third thing is, like I say, getting into a straight issue, a straight witness for character, I think would have opened up a terrible can of worms, which would have been really not beneficial to Mr. Jenkins.

*See* OHCH Transcript, Vol. II, pp. 42-43.

Moreover, at Petitioner's trial, *Trial Co-Counsel* did elicit testimony regarding Petitioner's care and treatment of C.C.J through State's witness, Ms. Naomi Griffith, and through defense witness, Ms. Violet Flint. *See* Trial Transcript, Vol. II, pp. 44-47; Trial Transcript, Vol. II, pp. 222-223, 225, 228-229, 231-235, 238-241. *Trial Co-Counsel* was able to elicit testimony from these two witnesses regarding Petitioner's prior care and treatment of C.C.J. in the course of questioning regarding other facts in Petitioner's case. These two witnesses were not strictly character witnesses.

The Petitioner essentially argues that this testimony was insufficient and that *Counsel* should have specifically elicited additional character evidence from his proposed witnesses when

-57-

he asked *Counsel* to do so. In making his argument, the Petitioner apparently fails to consider that the Court may very well have considered any further testimony of this nature to be redundant and unnecessary. *See* Ronnie R. v. Trent, 194 W. Va. 364, 371, 460 S.E.2d 499, 506 (1995) (acknowledging that under Rule 403 of the West Virginia Rules of Evidence, the lower court may not have permitted additional redundant character evidence).

This Court also seriously questions the veracity of Petitioner's testimony as the trial transcript clearly reflects that, at the conclusion of all testimony, Petitioner did not have any complaints regarding the manner *Counsel* had handled Petitioner's case up to that point. *See* Trial Transcript, Vol. III, p. 4.

Further, based upon the foregoing and a thorough review of the record, this Court finds that *Counsel's* final determination of which witnesses to call, and the manner by which *Trial Co-Counsel* elicited testimonial evidence regarding Petitioner's past care and treatment of C.C.J., was clearly part of *Counsel's* trial strategy. The Court also finds that *Counsel's* strategy and performance were not outside the realm of reasonably proficient service expected of a criminal attorney. The Court concludes that Petitioner's claim that he received ineffective assistance of counsel because *Counsel* allegedly refused to subpoena necessary character witnesses for his trial is without merit and fails under the reasonableness prong of a *Strickland/Miller* analysis.

### e. *Failure to disclose or call any expert witnesses*

The Petitioner claims that his *Counsel* was ineffective because *Counsel* did not secure and call an expert witness to testify on a variety of issues at his trial. Specifically the Petitioner argues that since Petitioner's case involved an abundance of medical and toxicological issues,

-58-

*Counsel* should have sought and elicited the testimony of an expert in his case, and in not doing so, *Counsel's* performance was deficient and ultimately resulted in the Petitioner's conviction.

The Petitioner has not provided, nor has this Court found, any statutory authority or case law that requires an expert to be utilized by defense counsel in a criminal trial. When the decision not to call an expert witness is the subject of collateral attack, counsel must show, however, that the decision not to utilize a defense expert was a reasonable one, given counsel's investigation of the case and all of the surrounding circumstances known to counsel at that time. *See* Ballard v. Ferguson, 232 W. Va. 196, 201, 751 S.E.2d 716, 721 (2013) (habeas relief is warranted when counsel's decision is not based upon a reasonable investigation); Syl. Pt. 3, State ex rel. Daniel v. Legursky, 195 W. Va. 314, 465 S.E.2d 416 (1995) (the rule of contemporary assessment dictates that "an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his or her choices." ).

Further, "[a] decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness. " State ex rel. Daniel v. Legursky, 195 W. Va. at 328, 465 S.E.2d at 430 (internal quotation and citation omitted). As long as the attorney's decision is reasonable, "what defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess. Obviously, lawyers always can disagree as to what defense is worthy of pursuing such is the stuff out of which trials are made." *Miller*, 194 W. Va. at 16, 459 S.E.2d at 127 (internal quotations and citations omitted).

-59-

Therefore, if counsel finds it unnecessary to utilize an expert, and this decision is based upon an adequate investigation into the facts of a defendant's case, this Court will not find counsel's performance to be deficient under the reasonableness prong of *Strickland/Miller*.

At the omnibus hearing, extensive testimony was elicited regarding *Counsel's* alleged failure to obtain an expert to testify regarding various medical issues at Petitioner's trial. *See* OHCH Transcript, 48-55, 81-84, 113-145. It is clear from the testimony that, prior to trial, *Counsel* had thoroughly reviewed the medical records and *Trial Counsel* had conducted an extensive independent investigation by travelling to the facilities and interviewing pertinent medical professionals regarding issues of possible contention in Petitioner's upcoming trial. *See id.* at 49, 52, 81, 135-136.

The Court also finds the following testimony offered by *Trial Counsel* at the first omnibus hearing, particularly important to the determination of whether *Counsel's* performance was deficient:

Q: And if CAMC states in their records that this other hospital had a urine screen, specifying Ativan being a benzodiazepine, why couldn't they detect Valium specifically for Oxycodone? And my question to you is, were you concerned about that language specifying a specific drug, but where's the other drugs?

A: Well, to be perfectly frank, not really. Again, the presence at all of benzodiazepine was, I thought, a benefit to the defense. And I thought Dr. Sabet's statement was the entire problem with - - not entire problem, but a very large problem with what was wrong with the State's case.

If I can get in a little dig here, it was an issue that the judge - - and we all talked about it. If I can get in a little dig here, it's one that the supreme court, the West Virginia Supreme Court, completely putted on when it was raised and brought to their attention on the appeal.

Q: Okay. Now, do you agree with me that this issue of whether there was a urine drug screen, how specific could a urine drug screen actually be, could it be true that a urine drug screen - - could it have detected a specific drug, could it not

-60-

have detected a specific drug, or could it just have detected benzos in general or again, specifically Ativan, if not Ativan, Valium and oxycodone, do you agree with me that that would have called for the presence of a defense expert witness to look at this and testify that, if you can find Ativan, you can find other drugs?

A:     Well, an expert would have been - - we discussed, Ms. Fraley and I, the use in getting an expert to go over these things. What Ms. Fraley didn't have and I did have was the advantage of going down and meeting with Dr. Kraner and Dr. Sabet at their offices in Charleston. And I did that as part of my investigation.

When I met with Dr. Kraner and I went through with him the blood · samples that he received - - and I believe I cross-examined the nurses and all about how they took the blood, and then I actually examined the bottles and I actually went back in the back with Dr. Kraner to see where these things were stored and that sort of thing.

As I recall from my conversation with Dr. Kraner, there was blood taken early at the hospital, and Dr. Kraner's analysis of that blood indicated the presence of both oxycontin and benzodiazepine. Okay? We also had Dr. Sabet saying that the combination is what killed him. And then as you were referring earlier, we had some confusion admitted, honest admitted confusion, from the investigating officer. In Detective Sizemore's experience, there was a little bit of confusion on how he got these things in his system.

So given what I thought the status of felony murder was in West Virginia, knowing that Dr. Kraner said, "Yes, this was here. This was in these samples," - - the urine sample taken at the hospital where they were giving him other drugs, - - for instance, if you look at some of the earlier records from Plateau, - - and I've just kind of thumbed through them while I was getting them here - - after he was in Plateau and they stabilized him, they gave him a number of these drugs.

And I remember discussing Ativan and Romazacom - - R-o-m-a-z-a-c-o-m for the court reporter - - and Narcan, I remember asking about all of those things. By the time he's at Dr. Chebib's and they're doing things, he's been filled with a lot of other drugs. So I thought the most reliable thing would be the blood tests that Dr. Kraner had.

Now, those blood tests showed that he had a low level, or what - - the term used, which I thought was important, was "therapeutic level" of oxycodone in his system and had a very high level of benzodiazepine.

Now, they're both in his system. I think that's undeniable. But I've got - - as the attorney, they're both there and I've got to deal with that. So, you know, again, the question becomes one of causation. I've got an indictment here that says that my client, Mr. Jenkins, killed him by giving him oxycodone. And even

the State's expert is saying "No. It's a combination of this," and something the State hasn't even addressed.

Again, I looked at all of this as a boon to the defense, not as something that an expert could come in and say, "Well, no." Expert testimony, given that, and given that time of the trial where we didn't know yet if Mr. Jenkins was going to testify or not or exactly what he was going to say, all of that led us to the conclusion that a little bit better just to say, "Look, members of the jury, he was killed by the combination of these drugs and they can't show any instance where Henry Jenkins actually handed any kind of drug, let alone benzodiazepine, over to [C.C.J.]."

So I think that, given that theory of the case, no, I don't think an expert was necessary. Now, Ms. Fraley and I kind of disagreed on that. I kind of went early on with the thought of doing a Daubert motion and going straight to the causation.

And again, getting in my digs, with the Supreme Court's ruling, which I've said to both you and Mr. Parsons, seems to me to establish a thin skull murder rule in the State of West Virginia, which I think is outrageous. They seem to think that causation was not an issue. They just seemed to say, "Well, it's a contributing factor. That's enough."

So looking back on it, I think going straight with the other theory and not using an expert was actually a better strategy.

Q:     So you had that - - you and Ms. Fraley had that, in essence, planned before going trial?

A:     We discussed it. We discussed it at length. And specifically in the realm of a Daubert motion to say that the State didn't have the scientific ability to say that oxycodone was, in fact, the primary cause of [C.C.J.'s] death. But given the - - both the Rodoussakis decision and then the decision of the Supreme Court made in Mr. Jenkin's case, which I've stated my disagreement with many times, I think they showed that an expert really wasn't, not only a strategic decision, but probably unnecessary.

OHCH Transcript, pp. 134-138.

It is clear to this Court that *Counsel* conducted a thorough investigation into the medical and toxicological issues in the case and concluded that it was better trial strategy to attack the

causation issue through the use of the State's own experts' testimony, rather than attempting to contradict that testimony through the use of an independent defense expert.

Moreover, "[a]s is often said, nothing is so easy as to be wise after the event." State v. Miller, 194 W. Va. 3, 17, 459 S.E.2d 114, 128 (1995). Habeas counsel "with luxury of time and the opportunity to focus resources on specific facts of a made record, inevitably will identify shortcomings in the performance of prior counsel." Id. It is for this exact reason that this Court "must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions." Id.

Based upon what *Counsel* learned through an independent investigation and what was known to *Counsel* at the time *Counsel* made the decision not to use an independent defense expert, this Court cannot find *Counsel's* decision to be unreasonable or outside the realm of reasonably proficient service, even though the end result was not what Petitioner and *Counsel* had hoped for.

Even though the Court concludes that the Petitioner is entitled to no relief upon this claim because *Counsel's* performance was not deficient under the first prong of *Strickland/Miller*, the Court still takes this opportunity to note that the Petitioner is also not entitled to relief under the second prong of *Strickland/Miller*.

Before relief may be granted upon an ineffective assistance of counsel claim, the Petitioner must also establish by a preponderance of the evidence that the results of the

-63-

proceeding would have been different had *Counsel* utilized a defense expert. *See Strickland*, 466

U.S. 668, 104 S.Ct. 2052; *see also Miller*, 194 W. Va. 3, 459 S.E.2d 114.

At the omnibus hearing, the Petitioner did not present this Court with any evidence,

beyond mere speculation, to show that he suffered prejudice as a result of *Counsel* not utilizing

the services of an independent defense expert. Further, the Petitioner did not elicit the testimony

of an expert, to show how an independent expert's testimony at Petitioner's trial would have

*actually* impacted or altered the evidence presented by the prosecution or the defense.

Petitioner's speculation and conjecture are not a sufficient substitute for concrete evidence. *See*

Coleman v. Painter, 215 W. Va. 592, 597, 600 S.E.2d 304, 309 (2004) (finding guesswork and

speculation not sufficient to support a claim that counsel failed to elicit the services of an expert

witness). As such, this Court finds that the Petitioner has failed to establish that the results of the

Petitioner's trial would have been different had *Counsel* utilized the services of an independent

defense expert.

Based upon the foregoing, this Court concludes that the Petitioner is entitled to no relief

based upon his claim that *Counsel* was ineffective for not utilizing the services of an independent

defense expert because the Petitioner has failed to establish either prong of *Strickland/Miller*.

### f. *Failure to have an authenticating witness*

Petitioner argues that he is entitled to relief on the basis of ineffective assistance of

counsel because his *Counsel* allegedly failed to have a witness available to authenticate a

medical record regarding a past hospitalization of C.C.J. Specifically, Petitioner argues that

during the cross examination of Patricia Paruscio, C.C.J.'s maternal grandmother, *Trial Co-*

*Counsel* was unable to authenticate and admit a medical record where C.C.J. was allegedly

-64-

hospitalized as a result of C.C.J.'s mother misinforming Ms. Paruscio of the dosage of medication C.C.J. was to receive. *See* Trial Transcript, Vol. II, pp. 22-23. The Petitioner further argues that *Trial Co-Counsel* "had to abandoned [sic] this important line of questioning" due to the absence of an authenticating witness. *See Amended Petition*, Sect. 3, subsec. i, p. 26.

A habeas petitioner seeking relief based upon a claim of ineffective assistance of counsel "must prove his allegation by a preponderance of the evidence." Syl. Pt. 22, State v. Thomas, 157 W. Va. 640, 203 S.E.2d 445 (1974); *see also* State ex rel. Scott v. Boles, 150 W.Va. 453, 147 S.E.2d 486 (1966).

During the omnibus hearing, the Petitioner did not elicit any testimony from *Trial Co-Counsel* regarding the alleged medical records and only minimal testimony from *Trial Counsel* regarding this contention. *See* OHCH Transcript, pp. 157-159. This Court is left without the benefit of knowing whether the medical records actually exist or what information may be contained therein because the Petitioner did not enter the subject medical record into evidence at the omnibus hearing.

This Court finds Petitioner's allegation to be speculative at best as the Petitioner has failed to present this Court with any evidence to show: 1) How this line of questioning was "important"; and 2) what was actually contained in the medical records. As such, this Court finds that Petitioner has failed to present sufficient evidence to prove by a preponderance of the evidence that his *Counsel's* performance was deficient under an objective reasonableness standard.

Further, the Petitioner has failed to present any evidence to show how the admission of these medical records would have affected the outcome of Petitioner's case. Even if this Court

-65-

had the benefit of the actual medical record, however, it is clear from a review of the trial record, that the authentication and admittance of these medical records would not have materially altered any relevant evidence that supported Petitioner's conviction. *See* Trial Transcript, Vol. II, pp. 22-24.

Based upon the foregoing, this Court concludes that Petitioner has failed to establish under either prong of *Strickland/Miller* that his *Counsel* was ineffective for failing to have a witness to authenticate the subject records for admission into evidence.

### g. *Failure to establish when blood was drawn*

The Petitioner contends that his *Counsel* was ineffective for allegedly not establishing when the tested blood was drawn at Plateau medical center. Specifically, the Petitioner argues that there was conflicting testimony concerning the time that the tested blood was drawn from C.C.J., while he was initially treated at Plateau Medical Center. *See Amended Petition*, Sect. 3, subsec. j, pp. 26-27. Further, Petitioner alleges that this question of whether the blood was drawn from C.C.J. before or after C.C.J. was administered Ativan, a benzodiazepine, remained unanswered because Petitioner's *Trial Counsel* "did not actively pursue nor conclusively draw answers as to when the tested blood was drawn." *See* id.

The Court has thoroughly reviewed the trial record and finds that the Petitioner's allegation and argument are factual misstatements of the record. The Petitioner asserts that the actual time of the blood draw from C.C.J. was never established. Contrary to Petitioner's assertion, the record reflects that although initially there was some confusion whether the tested blood was drawn at 10:48 a.m. or 11:14 a.m., this was *clarified by Trial Counsel on cross examination. See* Trial Transcript, Vol. I, pp. 134-135.

-66-

The Petitioner also asserts in the *Amended Petition* that "the answer remained elusive as to when the blood [that] ultimately tested positive for diazepine was drawn, before or after the decedent was given Ativan, a diazepine[]" and "[t]o underscore this inconclusive yet all-important issue, on re-direct examination, Dr. Poland was asked by the prosecution whether the blood was drawn before the drugs were administered and he said 'yes and no'." *Amended Petition*, Sec. 3, subsec. j, p. 27.

The relevant portion of the trial record reveals the following testimony by Dr. Poland:

Q:      Doctor, just so we can be clear, I know you testified that you took the blood samples that are contained in those photographs before any treatment, essentially, was done. Then there was some question about times and numbers and such. If I understand your testimony correctly, - - is it true that the blood sample that you took that is shown in these photographs, that you handed Ms. Keffer, that was drawn before you-all gave this boy any treatment? Is that true?

A:      Before any treatments?

Q:      Well, before you gave him any drugs, I should say.

A:      *Yes and no.* We gave him the resuscitative drugs like epinephrine, bicarb, probably the Narcan, Romazacon. And when I gave him the Ativan, that's not a resuscitative drug. That's down the list. I mean, that's to keep him calm so he doesn't wake up and start fighting during transport. But that was after he had responded to the ACLS protocol.

Trial Transcript, Vol. I, p. 140.

The prosecutor had also inquired earlier on direct examination whether Ativan was administered before or after the test blood was drawn:

Q:      And did you ever prescribe or administer to this child any Valium or benzodiazepine?

A:      Yes, sir.

Q:      You did?

-67-

A:      Yes. He got two milligrams of Ativan towards the end of the resuscitation when he was starting to buck a little bit, wake up, move.

Q:      Now, was this after you drew the blood or before?

A:      After.

Q:      After you drew the blood.

A:      Yes.

Q:      All right. So before you drew the blood, you had not administered any Valium.

A:      No, sir.

Trial Transcript, Vol. I, p. 132.

The Court again finds that Petitioner's assertions are factually inaccurate and presented wholly out of context with the surrounding testimony.

Based on the foregoing, this Court finds and concludes that Petitioner's assertion that his *Counsel* was ineffective because *Trial Counsel* allegedly did not clarify and establish when the test blood was drawn, is wholly without merit, frivolous, and unsupported by the record.

### h. *Failure to object and seek curative instructions where appropriate*

Petitioner argues that *Counsel* should have objected on multiple occasions for various reasons, throughout Petitioner's trial. In the interest of brevity, the Court will collectively address Petitioner's various allegations concerning *Counsel's* alleged failure to object at appropriate times since the central issue may largely be addressed under the same relevant law.

A petitioner seeking relief from conviction based upon claims that his counsel provided him with ineffective assistance, must first establish, by a preponderance of the evidence, that his counsel's performance was deficient under an objective standard of reasonableness. *See*

-68-

*Strickland*, 466 U.S. 668, 104 S.Ct. 2052; *see also Miller*, 194 W. Va. at 6, 459 S.E.2d at 117. To ensure that the objective standard is maintained, a court must assess counsel's performance based upon what was known and reasonable at the time; the Court must not use hindsight to elevate a possible mistake into a deficiency of constitutional proportion. Syl. Pt. 4, *Legursky*, 195 W. Va. at 317, 465 S.E.2d at 419; *see also* State ex rel. Edgell v. Painter, 206 W. Va. at 172, 522 S.E.2d at 640.

Further, where those instances of counsel's alleged deficient performance arise from tactical choices, strategy, or arguable courses of action, counsel's performance will be found to be sufficient unless no reasonably qualified attorney would have conducted themselves in a like manner. *See* Syl. Pt. 21, *Thomas*, 157 W. Va. at 643, 203 S.E.2d at 449 (1974). "A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 (internal quotations and citations omitted).

After a petitioner has successfully navigated the first hurdle of his ineffectiveness claim, he must then establish, by a preponderance of the evidence, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. 668, 104 S.Ct. 2052; *see also Miller*, 194 W. Va. at 6, 459 S.E.2d at 117. In essence this second prong is simply a determination of whether the petitioner has been unfairly prejudiced by his counsel's deficient performance. *See* Coleman v. Painter, 215 W. Va. 592, 596, 600 S.E.2d 304, 308 (2004); *see also* Syl. Pt. 9, State v. England, 180 W. Va. 342, 345, 376 S.E.2d 548, 551 (1988) citing Syl. Pt. 19, State v. Thomas, 157 W.Va. 640, 203

S.E.2d 445 (1974) (noting "that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.").

Having reiterated the relevant standards of review applicable to Petitioner's ineffectiveness claim, the Court will now proceed to address Petitioner's overall objection claims.

### 1) Failure to object to lay witness' opinion on legal weight of evidence

Petitioner argues that he is entitled to habeas relief because his *Counsel* was allegedly ineffective for not objecting to a portion of Detective Sizemore's testimony regarding the legal weight of the evidence. *See Amended Petition*, Sect. 3, subsec. b, pp. 14-16.

The relevant portion of testimony occurs as follows during redirect examination:

Q:     Detective Sizemore, if I could ask you to recall the original question about your belief or your opinion, if you will, as to the proof that Mr. Jenkins actually delivered these drugs to his son, and I believe you wanted to answer the question more fully but didn't get the opportunity. So I would ask you, if you'd like to, you may explain yourself and your reasoning.

A:     Unlike a lot of drug cases, we don't have a video of a controlled purchase in this case. [C.C.J.] is dead, and he can't tell us who gave him the drugs.

But all - - all - - of the circumstantial evidence that we've gather in this case - - the Holly Burdette statement, the phone conversations between Henry Jenkins and Naomi Lucas Griffith, the statement from Josh Settle, statements from Marshall Walker and Shaun Stark, the autopsy findings from Dr. Sabet and Dr. Kraner - - everything that we've gathered is consistent.

There's some minor discrepancies here and there on facts that may not mean anything, but there's no question [C.C.J] had oxycodone and Valium in his system. Henry Jenkins obtained oxycodone from Josh Settle. And those drugs were a contributing factor towards this child's death.

Q:     And isn't it true, Detective, that in at least two of the phone calls that we all heard, this man indicated he gave the drugs to his son, confessed it? Is that true?

A:     Yes, sir.

-70-

Q:	So when I ask you to refer back to your police report, Page 11, and this sort of summarizes everything in the police report, when you said, "Given the absence of a truthful statement by Henry Jenkins, there's no way to prove beyond a reasonable doubt," so on and so forth, in fact, we have, we would assume, a truthful statement from Henry Jenkins, don't we?

A:	In essence, yes, sir.

Mr. Parsons:	That's all I have, Your Honor. Thank you.

The Court:	Recross.

Trial Transcript, Vol. II, pp. 174-175.

The foregoing testimony, which is the basis for Petitioner's contention, was actually elicited by the prosecutor in direct response to *Trial Counsel's* line of questioning on cross examination. *See* id. at pp. 161-163, 170-173.

Moreover, during the omnibus hearing, *Trial Counsel* testified that, to the best of his recollection, the evidence and testimony Detective Sizemore referred to had already been put before the jury earlier in the trial. *See* OHCH Transcript, p. 109.

After a thorough review of the record, this Court does not disagree with *Trial Counsel's* recollection. This Court finds that, for all intent and purpose, the subject testimony is a summation of prior evidence and testimony.

*Trial Counsel* also testified that, based upon the context that the testimony was taken and strategic trial considerations, they did not necessarily find the testimony objectionable. *See* id. at 107-110.

At Petitioner's trial, it is clear that one of *Trial Counsel's* strategies was to attack the issue of the actual transfer or delivery of oxycodone from the Petitioner to C.C.J. On cross examination, *Trial Counsel* had attempted to accomplish this strategic task by attacking various

-71-

portions of Detective Sizemore's investigation. *See* Trial Transcript, Vol. II, pp. 161-174. *Trial Counsel's* cross examination also drew particular emphasis upon Detective Sizemore's prior revelation in a letter to Dr. Sabet, and during Detective Sizemore's testimony at Petitioner's preliminary hearing, that it was unlikely that the detective would ever be able to establish with any degree of certainty that the Petitioner had given the drugs to [C.C.J.]. *See* id. at pp. 170-173.

Moreover, the trial record reveals that *Counsel's* strategy was also to attack the causation element of C.C.J.'s death as a result of both oxycodone *and vallium* rather than oxycodone alone, as the Petitioner's felony murder indictment was based solely upon the delivery of oxycodone. *See* id. at 173; Trial Transcript, Vol. III, pp. 94-95, 99-100; *see also* OHCH Transcript, pp. 142-143.

This Court finds that *Counsel's* failure to object to the subject portion of Detective Sizemore's testimony arose from an occurrence involving *Counsel's* tactical trial strategy. Also, the Court is unable to find that no reasonably proficient defense attorney would have taken the same strategic approach as did *Counsel*.

Based upon the foregoing, this Court concludes that *Counsel's* performance was not deficient under the first prong of the *Strickland/Miller* test.

Even if this Court would assume, arguendo, that *Counsel's* performance was deficient for not objecting to the subject testimony, the Petitioner would still be entitled to no relief upon the basis of this contention. As the testimony was a summation of prior testimony and evidence, had *Counsel* successfully put forth an objection, it is highly unlikely that this would have altered the outcome of Petitioner's case. As such, the Court concludes that the Petitioner's contention also fails under the second prong of *Strickland/Miller* because the Petitioner has failed to show by a

-72-

preponderance of the evidence, that he suffered any prejudice as a result of *Counsel* not objecting

to Detective Sizemore's summation testimony.

### 2) Failure to object and seek curative instruction over inappropriate bolstering of other witnesses' credibility

Petitioner argues that his *Counsel* was ineffective because he did not object and seek a

curative instruction when, during redirect examination, Dr. Sabet testified as follows:

Q: Sir, was there anything that you found in your examination or in your knowledge and experience or, for that matter, anyone in your office's knowledge and experience that, based on your examination, was inconsistent with what Detective Sizemore shared with you in terms of his investigation?

A: Based on information that - - *I trust law enforcement, generally,* - - it's consistent - - autopsy findings were consistent with the findings.

Trial Transcript, Vol. I, p. 240 (*emphasis added*).

At the omnibus hearing, *Trial Co-Counsel* testified that she found the statement, "I trust

law enforcement, generally," to be tactically useful because on the initial death certificate the

death was classified as "natural" but, after Dr. Sabet consulted with Detective Sizemore

regarding the investigation, the classification was changed on the final report. *See* OHCH

Transcript, pp. 67-68. *Trial Co-Counsel* further testified that she had hoped to convince the jury

that the medical examiners determination of the final cause of death was made as a "rubber

stamp" based upon the investigating officer's opinion, rather than on an independent medical

examination. *See* id. at 67-73. On this point, the Court finds that the trial record supports *Trial

Co-Counsel's* omnibus hearing testimony. Both on cross examination and during closing

arguments, *Trial Co-Counsel* established this "trusting" relationship between the medical

examiner and the investigating officer and argued this "rubber stamp" theory to the jury. *See*

-73-

Trial Transcript, Vol. I, pp. 228-239; Trial Transcript, Vol. III, pp-97-99; *see also* OHCH Transcript, p.148.

The Court finds that *Trial Co-Counsel* made a strategic tactical decision not to object to the subject statement made by Dr. Sabet. This Court is also of the opinion that a reasonably proficient defense attorney could have chosen to take the same strategic approach as did *Trial Co-Counsel.*

Based upon the foregoing, this Court concludes that *Counsel's* performance was not deficient under the objective reasonableness standard outlined in *Strickland/Miller.*

### 3) Failure to object to extensive leading questions

The Petitioner goes to great lengths to point out multiple instances where Petitioner's *Counsel* allegedly failed to lodge an objection to various leading questions by the prosecution. *See Amended Petition*, Exh. B.

Rule 611 of the West Virginia Rules of Evidence provides in relevant part that "leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." W. Va. R. Evid. 611(c). This rule is not a hard and fast rule, however, as there are multiple exceptions to this rule and its application is wholly left to the discretion of the court. *See* State v. Fairchild, 171 W. Va. 137, 150, 298 S.E.2d 110, 124 (1982); *see also* State v. McPherson, 179 W. Va. 612, 371 S.E.2d 333 (1988); State v. Cottingham, No. 13-1211, 2014 WL 5545930 (W. Va. Nov. 3, 2014) (unpublished opinion). In the event a "leading" objection is lodged, and the Court sustains the objection, the party eliciting the testimony is given an opportunity to cure and overcome the objection by simply rephrasing the question. *See* State v. Price, 92 W. Va. 542, 115 S.E. 393, 394 (1922).

In the case at bar, the Petitioner was represented by not one, but two, trial attorneys. *Trial Counsel* and *Trial Co-Counsel* were both very experienced in criminal trial matters having in excess of forty-three (43) years of combined criminal trial experience at the time of Petitioner's trial. *See* OHCH Transcript, pp.73-74, 91. Significant testimony was taken at the omnibus hearing with regard to *Counsel's* alleged failure to object to various leading questions during the Petitioner's trial. *See* OHCH Transcript, pp. 31-43, 164-168. Further, there was considerable disagreement between Petitioner's *Habeas Counsel* and *Counsel* as to: 1) whether many of the subject questions were in fact leading questions; 2) the context in which the subject questions were made; 3) whether the questions referred back to testimony or evidence that had already been placed before the jury; 4) whether the questions were used to develop the testimony; and 5) whether strategic and tactical considerations played a role in *Counsel's* approach to the leading questions. *See* id.

A thorough review of the trial record and omnibus hearing transcript reinforces that "[t]he widespread use of the tactic of attacking trial counsel by showing what 'might have been' proves that nothing is clearer than hindsight-except perhaps the rule that we will not judge trial counsel's performance through hindsight." Miller, 194 W. Va. at 17, 459 S.E.2d at 128 (citation omitted).

When questioned on direct examination by Petitioner's *Habeas Counsel, Trial Counsel's* testimony very accurately summed up this principle; there is a vast difference, in the context of the trial, between what *could* have been objected to and what *should* have been objected to. *See* OHCH Transcript, pp. 166-167. As the *Miller* Court emphasized,

> [w]hat defense to carry to the jury, what witnesses to call, and what method of
> presentation to use is the epitome of a strategic decision, and it is one that we will

seldom, if ever, second guess. ***Obviously, lawyers always can disagree as to what defense is worthy of pursuing*** 'such is the stuff out of which trials are made.'

Miller, 194 W. Va. at 16, 459 S.E.2d at 127 (1995) citing Solomon v. Kemp, 735 F.2d 395, 404 (11th Cir.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985) (***emphasis added***).

Based upon the foregoing and a thorough review of the record, the Court finds that *Counsel* did not lodge objections to leading questions by the prosecution, in the instances to which Petitioner refers, due to tactical or strategic considerations by *Counsel*. The Court further finds and concludes that the Petitioner's has failed to show by a preponderance of the evidence that *Counsel's* performance was deficient, in these instances, under the objective standard of reasonableness prong of *Strickland/Miller*.

Even if this Court assumes, arguendo, that *Counsel's* performance was deficient for not lodging an objection in those instances cited by the Petitioner, the Court is of the opinion that Petitioner is still not entitled to any relief because his claim fails under the prejudice prong of *Strickland/Miller*.

As noted *supra*, a sustained objection to a leading question can readily be remedied by simply rephrasing the question. Further, most of the instances cited by the Petitioner where *Counsel* did not object to leading questions by the prosecution, involved testimony and evidence which had either already been placed before the jury, or were introductory in nature and used for the purpose of developing the subject testimony on often immaterial facts unlikely to influence the jury's decision. Lastly, this Court finds that the Petitioner has simply failed to provide this Court with any evidence, aside from the blanket statement that the Petitioner was prejudiced, to

-76-

show that there is a reasonable probability that but for *Counsel's* failure to object to the cited leading questions, there is a reasonable probability that the Petitioner would have been acquitted.

Based upon the foregoing, this Court concludes that Petitioner's claim that his *Counsel's* performance was ineffective because counsel did not object to several leading questions by the prosecution fails under the prejudice prong of *Strickland/Miller*.

### 4) Failure to object to substantive testimony over exhibits marked for identification purposes only

The Petitioner claims that his *Counsel* was ineffective because *Counsel* allegedly failed to object to substantive testimony regarding exhibits which were marked for identification purposes. Specifically, the Petitioner argues that his *Counsel* was ineffective because *Counsel* did not object to testimony elicited, prior to the exhibits admission into evidence, regarding 1) Photographs of blood vials marked State's Exhibits 6, 7, and 8; and 2) A portion of the Plateau Medical Center's medical records marked State's Exhibit 5.

### a. Photographs of blood vials marked Exhibits 6, 7, and 8.

The first of Petitioner's two arguments under this ineffectiveness claim can be readily disposed of under the second prong of *Strickland/Miller*. *See* State ex rel. Daniel v. Legursky, 195 W. Va. at 321, 465 S.E.2d at 423 (noting the court "need not address both prongs . . . but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test."). In this instance, even if the Court were to find that *Counsel's* performance was deficient, and assume, arguendo, that the Court would have sustained an objection to substantive questioning of these witnesses prior to the admission of State's exhibits 6, 7, and 8, the Petitioner is unable to show that the results of his trial would have in any way been altered. The exhibits that served the basis for Petitioner's claim were ultimately admitted into evidence over *Trial*

*Counsel's* foundational objection. *See* Trial Transcript, Vol. I, pp. 186-188; *see also* id. at 206-207. An earlier successful challenge may have delayed the substantive questioning and required the prosecutor to laboriously establish the evidence's foundation prior to that questioning, but it would not have altered the final admission of the evidence; Exhibits 6, 7, and 8, inevitably would have still been admitted into evidence and the same substantive questioning elicited by the prosecutor.

Under the presented scenario, the Court finds that the Petitioner is incapable of establishing that but for *Counsel's* failure to object to the substantive questioning of witnesses regarding State's exhibits 6, 7, and 8, prior to that evidence being admitted, the evidence would not have been admitted and the results of Petitioner's trial would have been different. As such the Court concludes that the Petitioner has suffered no prejudice from the alleged deficient performance of *Counsel* and is thereby entitled to no habeas relief upon this claim under the second prong of *Strickland/Miller*.

### b. A portion of the Plateau Medical Center's medical records marked State's Exhibit 5.

The Petitioner also argues that his *Counsel* provided ineffective assistance because *Counsel* allegedly did not object to the testimony of Leslie Tweedie regarding a portion of State's exhibit 5, when that exhibit was never admitted into evidence. *See Amended Petition*, Sect. 3, subsec. f, p. 24.

"[A] petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release." Syl. Pt. 1, in part, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486, (1966). "[A] [mere] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." State ex rel.

-78-

Hatcher v. McBride, 221 W. Va. at 766, 656 S.E.2d at 795 (citations omitted) (alterations from original).

At the omnibus hearing, the Petitioner failed to present any evidence, or elicit any testimony, in support of his argument regarding States exhibit five and the testimony of Ms. Leslie Tweedie. Petitioner's argument remained undeveloped to the conclusion of the omnibus proceedings. As such, the Court finds that the Petitioner has failed to meet his burden of proof to support his contention regarding State's exhibit 5 and the testimony of Ms. Tweedie.

Further, the Court has thoroughly reviewed the trial record and finds that Petitioner's allegation is unfounded. The witness, Leslie Tweedie, was being questioned by the prosecutor regarding the testing of blood drawn from C.C.J during treatment. *See* Trial Transcript, Vol. I, pp. 165-169. Ms. Tweedie, however, could not remember any specifics surrounding the testing that was conducted. *See* id. at 165-166. State's exhibit 5 was presented to Ms. Tweedie by the prosecutor only to refresh her recollection of the matter and the State never sought to have exhibit 5 admitted for any individual evidentiary purpose. *See* id. at 166.

Based upon the foregoing, the Court concludes that, under both prongs of *Strickland/Miller*, the Petitioner is entitled no relief in this habeas based upon his argument that his *Counsel* provided him with ineffective assistance in that *Counsel* allegedly failed to object to the substantive questioning of Ms. Tweedie regarding State's exhibits 5.

### 5) Failure to object and seek a curative instruction over lay witnesses testifying as experts

The Petitioner argues that his *Counsel* was ineffective for failing to object and seek a curative instruction when two lay witnesses allegedly offered expert testimony. The two incidents that serve as the basis for Petitioner's argument occurred 1) when Detective Sizemore

testified on various issues regarding the abuse of prescription medications; and 2) when Naomi Lucas Griffith testified regarding the use and nature of the prescription drug Klonopin.

The Court will address each in turn.

### a. Detective Sizemore's "expert" testimony

In the *Amended Petition*, the Petitioner alleges that at his trial, Detective Sizemore offered improper expert testimony as a lay witness concerning: 1) the dosages of medications; 2) the manner by which medications could be taken; 3) the relationship of itching and the use of morphine based drugs; and 4) the schedule classification of Oxycodone. *See Amended Petition*, Sect. g, p. 25.

"[A] petitioner has the burden of proving by a preponderance of the evidence the allegations contained in his petition or affidavit which would warrant his release." Syl. Pt. 1, in part, *Boles*, 150 W. Va. 453, 147 S.E.2d 486.

At the omnibus hearing, however, the Petitioner elicited no testimony from *Trial Counsel* regarding Detective Sizemore's alleged "expert" testimony and very limited testimony from *Trial Co-Counsel. See* OHCH Transcript, pp. 90-168; *see also* id. at 63. The Petitioner's one inquiry at the omnibus hearings was limited to a question regarding Detective Sizemore's testimony related to the dosages of medication. *See* OHCH Transcript, p. 63, lines 12-15. *Trial Co-Counsel* responded that this line of questioning was regarding a Board of Pharmacy report which was obtained by Detective Sizemore in the course of his investigation. *See* id. p. 63, lines 16-21.

A review of the trial record confirms that the line of questioning regarding the type and dosages of medication that had previously been prescribed to C.C.J. was in fact testimony related

-80-

to a Board of Pharmacy report that was obtained by Detective Sizemore in the course of his investigation and was not an expert opinion. *See* Trial Transcript, Vol. II, pp. 151-152.

The Petitioner also did not offer any evidence whatsoever to show how Petitioner was prejudiced as a result of *Counsel's* performance with regard to Detective Sizemore's alleged "expert" testimony.

The Court finds that the Petitioner has fallen woefully short of meeting his burden of persuasion. The Petitioner has quite simply failed to prove *Counsel's* performance was deficient in this regard and that the Petitioner suffered any prejudice as the result of *Counsel's* alleged deficiency.

Based on the foregoing, the Court concludes that the Petitioner has failed to supply this Court with sufficient evidence to show that his *Counsel* was ineffective in not objecting to the alleged "expert" testimony of Detective Sizemore under either prong of the *Strickland/Miller* standard.

### b. Naomi Lucas Griffith's "expert" testimony

In the *Amended Petition*, the Petitioner alleges that at his trial, Naomi Griffith offered improper expert testimony as a lay witness concerning the use and nature of the prescription drug Klonopin. *See Amended Petition*, Sect. g, p. 25.

The following is the relevant portion of the subject testimony regarding a prior incident where C.C.J. had ingested prescription medication which had previously been given to him by the Petitioner:

Q:      Who was there?

A:      [C.C.J.] and Henry were there when I - - when I walked in. I walked in the house, and I was like, "What the hell's going on? What happened?" And was like, "Well," - -

-81-

Q:       Who was "he"? Who's "he," ma'am?

A:       Henry.

Q:       Okay.

A:       He said, "Well, I gave him some Klonopins yesterday." And I was like, "Why was you giving him Klonopins?"

And he said, "Well, his back was hurting and he couldn't sleep and stuff, and I just gave him some Klonopins and, apparently, he was passed out on the front porch, and I" - - the neighbors woke him up.

Apparently, the neighbors had seen him and woke Henry up. He was inside asleep. And they - -

Q:       *Is Klonopin some sort of pain medication?*

A:       *More like a nerve medication.*

Q:       *It's a prescription pill of some kind?*

A:       *Yes.*

Q:       Okay.

A:       And I was like, "Well, what happened? We've got to get him to the doctor." And he was like, "No, Annie. He's okay." And [C.C.J.] was standing there, and he was like, "No, Mom. I don't want to go to the doctor. I don't want to go to the doctor." . . ..

Trial Transcript, Vol. II, pp. 30-31 (*emphasis added*).

The Court will not use hindsight and second-guessing of *Counsel's* decisions to elevate a possible mistake into an error of constitutional proportion. *See* Syl. Pt. 4, *Legursky*, 195 W. Va. at 317, 465 S.E.2d at 419; *see also* State ex rel. Edgell v. Painter, 206 W. Va. at 172, 522 S.E.2d at 640. "A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial

-82-

with obvious unfairness. "*Legursky*, 195 W. Va. at 328, 465 S.E.2d at 430 (internal quotations and citations omitted). "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 21, *Thomas*, 157 W. Va. 640, 203 S.E.2d 445.

At the omnibus hearing, *Trial Co-Counsel* was questioned as to why she had not objected when the witness, Naomi Griffith, had testified regarding the identity and nature of the prescription drug Klonopin. *See* OHCH Transcript, p. 62. *Trial Co-Counsel* explained that she felt it was well established that the witness, Naomi Griffith, "had, in the past, a drug problem." Id. at line 18-19. *Trial Co-Counsel* further testified that she did not object to this line of questioning "because [she] thought it helped that it wasn't a pain medication, that it was a nerve pill." Id. at line 23-24.

*Trial Counsel* further testified regarding this same incident:

Q:       Okay. And does it concern you that this person was asked what type of medication Klonopin was?

A:       Well, she's clearly not an expert. And I would agree with you, she's clearly not an expert. But, I mean, just here today, you and I have had discussions of is Ativan a benzodiazepine. I didn't know that. But when we looked at Dr. Poland's testimony, he said that it was.

        Now, I know that certain things are pain medication, certain things are, for lack of a better term, nerve medication. I don't - - I can't tell you anything about them, but just to give you the basic, it's a prescription pill of some kind. I think that anybody would be qualified to answer that. I think that would be general knowledge.

Q:       Do you believe that there should have been an objection to that question, those two questions; what type of medication and whether it's prescription?

A:          ¯ I think that - - I've got to split hairs with you, and I'm sorry for that, Mr. Fast. I'm going to say there *could* have been an objection there. I won't say that there *should* have been an objection there. I'm not sure that I agree there should have been. But there clearly could have been.

OHCH Transcript, p. 154-155 (*emphasis* in original).

Based upon the foregoing, the Court finds that *Counsel* made a reasonable tactical decision not to object to the testimony of Naomi Griffith regarding the use and nature of the prescription drug Klonopin. Further, the Court concludes that the Petitioner has failed to prove that *Counsel's* performance was deficient under the objective reasonableness standard outlined in *Strickland/Miller*.

Even if this Court accepted, arguendo, Petitioner's assertion that his *Counsel's* performance was deficient in not objecting to Naomi Griffith's testimony regarding the use and nature of the prescription drug Klonopin, the Petitioner's claim would still fail.

A habeas petitioner seeking relief based upon a claim of ineffective assistance of counsel must not only establish that his counsel's performance was deficient, but also that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. 668, 104 S.Ct. 2052; Syl. Pt. 5, *Miller*, 194 W. Va. at 6, 459 S.E.2d at 117. Both prongs of *Strickland/Miller* must be proved by a preponderance of the evidence. *See* Syl. Pt. 22, *Thomas*, 157 W. Va. 640, 203 S.E.2d 445; *see also Boles*, 150 W.Va. 453, 147 S.E.2d 486.

The Petitioner presented this Court with no evidence to show how he was prejudiced by this very limited testimony. As such, the Court further concludes that Petitioner has also failed to establish the prejudice prong of *Strickland/Miller* and is thereby entitled no relief upon this claim.

-84-

## VIII. Excessive Sentence

The Petitioner asserts in his *Losh List* that he received an excessive sentence for his convictions to the felony offenses of felony murder and child neglect resulting in death. The Petitioner does not provide this Court with any explanation of how his sentence is excessive or of how the sentence he received was outside the parameters provided by the West Virginia Code. However, out of an abundance of caution and in the interest of thoroughness, this Court will discuss this ground for relief.

In West Virginia, "[o]ur system of criminal jurisprudence views a trial court's discretion during the sentencing phase of a criminal proceeding as a critical component of the process." State ex rel. Hatcher v. McBride, 221 W. Va. 760, 765, 656 S.E.2d 789, 794 (2007) (citing State v. Head, 198 W.Va. 298, 306, 480 S.E.2d 507, 515 (1996) (Cleckley, J., concurring). The length of time imposed at sentencing, as long as it is within the confines of statutory parameters and not based upon some impermissible factor, is at the sole discretion of the sentencing judge. *See generally* State v. James, 227 W. Va. 407, 710 S.E.2d 98 (2011); Syl. pt. 4, State v. Goodnight, 169 W.Va. 366, 287 S.E.2d 504 (1982); State ex rel. Hatcher v. McBride, 221 W. Va. at 761, 656 S.E.2d at 790; *see also* Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); United States v. White, 240 F.3d 127 (2d Cir. 2001). As the *James* Court noted,

> there is nothing that suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute. [W]here factual determinations are used to sentence the defendant to a sentence within the maximum allowed by statute, *Apprendi* is not controlling, and such determinations can be made by the court without violating the defendant's right to due process.

-85-

State v. James, 227 W. Va. at 418, 710 S.E.2d at 109 (citing Apprendi v. New Jersey, 530 U.S. 466, 481, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); United States v. White, 240 F.3d 127, 136 (2nd Cir.2001) (citations omitted)).

In Petitioner's case, the jury returned a verdict of guilty of murder in the first degree, with a recommendation of mercy. *See* Jury Verdict-Count One, *State of West Virginia v. Henry C. Jenkins*, Indictment No. 09-F-136. The jury also returned a verdict of guilty to the offense of child neglect resulting in death as a lesser included offense of death of a child by a parent. *See* Jury Verdict-Count One, *State of West Virginia v. Henry C. Jenkins*, Indictment No. 09-F-136.

West Virginia Code provides that "[m]urder of the first degree shall be punished by confinement in the penitentiary for life." W. Va. Code Ann. § 61-2-2 (West). West Virginia Code further provides that

> [i]f the person indicted for murder is found by the jury guilty thereof, and if the jury find in their verdict that he or she is guilty of murder of the first degree . . . he or she shall be punished by imprisonment in the penitentiary for life . . .: Provided, That the jury may, in their discretion, recommend mercy . . ..

W. Va. Code Ann. § 62-3-15 (West).

As it relates to the offense of child neglect resulting in death, the West Virginia Code provides that

> [i]f any parent, guardian or custodian shall neglect a child under his or her care, custody or control and by such neglect cause the death of said child, then such parent, guardian or custodian shall be guilty of a felony and, upon conviction thereof, shall be fined not less than one thousand dollars nor more than five thousand dollars or committed to the custody of the division of corrections for not less than three nor more than fifteen years, or both such fine and imprisonment.

W. Va. Code Ann. § 61-8D-4a (West).

-86-

The Court subsequently sentenced the Petitioner to life in the West Virginia Penitentiary, with a recommendation of mercy for his felony murder conviction and to the West Virginia Penitentiary for an indeterminate period of not less than three (3) years nor more than fifteen (15) years for his child neglect resulting in death conviction, said sentences to be served consecutively. *See* Sentencing And Commitment Order, entered June 28, 2010.

As to Petitioner's sentences, this Court finds that the Petitioner was sentenced consistent with the jury's verdicts and the sentencing parameters outlined in the West Virginia Code.

Based upon the foregoing, this Court concludes that Petitioner's contention that he received an excessive sentence for his conviction to the offenses of felony murder and child neglect resulting in death, is without merit and unsupported by the record.

## IX. Newly Discovered Evidence

The Petitioner asserts in his *Losh List* that relief is warranted in this habeas proceeding because new evidence has been discovered that would have likely altered the outcome of the Petitioner's trial had it been discovered prior to trial. Specifically, Petitioner testified during the omnibus evidentiary hearing that one of the prosecution's witnesses, Holly Dawn Burdette, was bragging to one of the Petitioner's friends, Chipper Shaver, that she was the one who had given C.C.J. the Oxycodone and Valium that ultimately resulted in the death of C.C.J.

As the West Virginia Supreme Court has previously stated,

> [t]he factors that must be satisfied in order to obtain a new trial based upon newly discovered evidence are as follows: . . . (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his or her affidavit that the defendant was diligent in ascertaining and securing the evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) *The evidence must be*

-87-

*such as ought to produce an opposite result at a second trial on the merits.* (5)
And *the new trial will generally be refused when the sole object of the new
evidence is to discredit or impeach a witness on the opposite side.*

State ex rel. Smith v. McBride, 224 W. Va. 196, 206-07, 681 S.E.2d 81, 91-92 (2009)

(alterations from original) (citations omitted) (*emphasis added*).

Of particular importance in Petitioner's case, are the fourth and the fifth factors of

*McBride*: "The evidence must be such as *ought to produce an opposite result* at a second trial on

the merits" and "[ ] the new trial will generally be *refused when the sole object of the new

evidence is to discredit or impeach a witness on the opposite side.*" Id. at 206, 681 S.E.2d at 91

(citations omitted) (*emphasis added*).

The Petitioner did not call, or attempt to elicit the testimony of, Mr. Shaver at the

omnibus evidentiary hearing; the Petitioner chose instead to present his own hearsay within

hearsay personal testimony as support for his contention. This Court gives scant merit to

Petitioner's evidence and finds that Petitioner has failed to show by a preponderance of the

evidence that "new" evidence even exists.

Even if this Court assumes, arguendo, that Petitioner's bald assertion does qualify as

"new" evidence in Petitioner's case, relief is still not warranted in this habeas proceeding

because this Court finds that the "new" evidence fails a *McBride* analysis.

At Petitioner's trial, the jury was presented the theory that C.C.J. had obtained the

oxycodone and valium either by his own accord or with the help of someone other than the

Petitioner. The jury rejected this theory. Likewise, this Court rejects Petitioner's assertion that a

jury would give Petitioner's "new" evidence such weight and credence so as to warrant

Petitioner's acquittal at a second trial on the merits.

-88-

Lastly, paramount to this Court's consideration is the fact that the "new" evidence appears to this Court to be exclusively and solely for the purpose of discrediting and impeaching one of the prosecution's key witnesses, Ms. Holly Burdette.

Based upon the foregoing, this Court concludes that the Petitioner's contention that "new" evidence exists which would warrant a new trial in this matter is unfounded and without merit.

## X.  Cumulative Effect Of Numerous Errors

The Petitioner finally asserts that the numerous errors alleged to have been committed prior to Petitioner's trial and in the course of Petitioner's trial, collectively operated to deny the Petitioner his state and federal constitutional rights.

The cumulative error doctrine may be applicable to proceedings where various errors combine to affect the overall validity of the judgment. *See generally* Tennant v. Marion Health Care Found., Inc., 194 W. Va. 97, 117-18, 459 S.E.2d 374, 394-95 (1995) (providing an overall assessment of the cumulative error doctrine). "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." State v. Carrico, 189 W. Va. 40, 47, 427 S.E.2d 474, 481 (1993) (citing Syl. Pt. 5, State v. Walker, 188 W.Va. 661, 425 S.E.2d 616 (1992)); Syl. Pt. 5, State v. Smith, 156 W.Va. 385, 193 S.E.2d 550 (1972).

Even though the cumulative error doctrine is available for use by a circuit court in situations where numerous harmless errors have impacted the outcome of a case, the doctrine should, however, be used sparingly. *See* Tennant v. Marion Health Care Found., Inc., 194 W. Va.

-89-

97, 118, 459 S.E.2d 374, 395 (1995). The cumulative error doctrine is only applicable when the record reveals that there are at least *some* errors. *See* id., at 118, 459 S.E.2d at 395; *see also* State v. Knuckles, 196 W. Va. 416, 426, 473 S.E.2d 131, 141 (1996) per curiam. Further, where the errors are insignificant and inconsequential, reversal is not warranted. Id. (citing I Franklin D. Cleckley, Handbook on Evidence § 1-7(B)(5) at 49); State v. Clements, 175 W. Va. 463, 472, 334 S.E.2d 600, 610-11, cert. denied, 474 U.S. 857, 106 S.Ct. 165, 88 L.Ed.2d 137 (1985).

In the case at bar, the Court has fully addressed the Petitioner's preceding twenty-eight (28) alleged grounds for relief *supra*. Having completed this arduous task, it is apparent to this Court that the Petitioner has blatently abused the *Losh List* by asserting many grounds which' were: 1) unsupported by the relevant law; 2) frivolous or wholly without merit; and/or 3) previously waived or adjudicated. It is *actual* error, not *alleged* error, which warrants relief in a habeas proceeding. *See generally* State v. Knuckles, 196 W. Va. 416, 426, 473 S.E.2d 131, 141 (1996) *per curiam* ("Cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."). Having thoroughly reviewed the relevant law and record related to Petitioner's remaining contentions, this Court has been unable to find any substantial constitutional error, or for that matter, *some* harmless constitutional errors, that occurred in Petitioner's case which may have operated to affect the validity of the judgment against the Petitioner.

Based upon the foregoing, this Court concludes that Petitioner's assertion that his state and federal constitutional rights were violated as a result of the cumulative effect of numerous errors that allegedly occurred during the Petitioner's trial is unfounded and without merit.

## XI. Knowing And Intelligent Waiver Of All Grounds Not Asserted In This Habeas Corpus Proceeding

Petitioner asserted a total of twenty-nine (29) grounds for relief in his *Losh List* and *Amended Petition* and the Court has fully addressed each ground in the preceding *Order Denying And Dismissing Petition*.

W.Va. Code § 53–4A–1 et seq. contemplates that a person who has been convicted of a crime is entitled to only one post-conviction habeas corpus proceeding wherein all grounds for relief must be raised, that are known or which could, with reasonable diligence, be discovered. Syl. Pt. 1, Gibson v. Dale, 173 W. Va. 681, 683-84, 319 S.E.2d 806, 808 (1984). A petitioner may not, in a subsequent habeas petition, raise those grounds knowingly and intelligently waived in a prior proceeding. Syl. Pt. 2, id. at 684, 319 S.E. 2d at 809.

Further, the Supreme Court has expressly addressed the res judicata effect of an omnibus habeas proceeding by stating the following:

> [j]udgment denying relief in post conviction habeas corpus is res judicata on questions of fact or law which have been fully and finally litigated and decided, and as to issues which with reasonable diligence should have been known but were not raised, and this occurs where there has been an omnibus habeas corpus hearing at which the applicant for habeas corpus was represented by counsel or appeared pro se having knowingly and intelligently waived his right to counsel.

Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606 (1981). The Supreme Court expressed that although a prior omnibus habeas corpus hearing is res judicata, to matters raised or that reasonably should have been raised, "an applicant may still petition the court on the following grounds: ineffective assistance of counsel at the omnibus habeas corpus hearing; newly discovered evidence; or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, id. at 762, 277 S.E.2d at 608. An omnibus habeas corpus ruling is final

and any subsequent petition will be summarily dismissed unless it addresses one of these three

enumerated exceptions. *See* id. at 768, 277 S.E.2d at 611. "A judgment entered of record,

remanding a petitioner after a hearing upon a writ of habeas corpus, which has not been reversed,

is conclusive upon other application." Syllabus, State ex rel. Clevenger v. Coiner, 155 W. Va.

853, 188 S.E.2d 773, 774 (1972); Syllabus, State ex rel. Presty v. Lowe, 103 W.Va. 264; 137

S.E. 219 (1927).

The Petitioner was informed at the beginning of the omnibus habeas corpus evidentiary

hearing that any grounds not asserted in this habeas proceeding were waived. *See* OHCH

transcript, Vol. I, pp. 3-7. The Petitioner advised the Court that he knowingly understood that

he was waiving all other grounds except for those asserted in the Petitioner's *Losh List. See* id.

Based upon the foregoing, the Court finds that the Petitioner was given the opportunity,

with the assistance of counsel, to raise any and all grounds for relief that the Petitioner believed

warranted relief in this habeas proceeding. The Court also finds and concludes that the Petitioner,

with the assistance of counsel, has knowingly waived all other contentions and grounds not

raised in this habeas proceeding.

## XII.   ASSESSMENT OF FEES AND COSTS FOR THIS PROCEEDING
   PURSUANT TO W.VA. CODE § 53-4A-4(b)

The Petitioner proceeded in forma pauperis in the prosecution of this habeas matter.

Pursuant to West Virginia Code, a petitioner who alleges sufficient facts to show to the

satisfaction of the Court that he or she is unable to pay the costs of the proceeding or to employ

counsel, may be permitted to proceed in forma pauperis in the prosecution of a petition under

W.Va. Code § 53-4A-1 for a writ of habeas corpus. W. Va. Code Ann. § 53-4A-4(a) (West).

W.Va. Code § 53-4A-4(b) further provides that

-92-

all necessary costs and expenses incident to [habeas] proceedings hereunder, originally, or on appeal pursuant to section nine of this article, or both, including, but not limited to, all court costs, and the cost of furnishing transcripts, shall, upon certification by the court to the state auditor, be paid out of the treasury of the State from the appropriation for criminal charges.

At the conclusion of the habeas matter, the Court shall grant that relief, if any, which is warranted under the circumstances and shall "adjudge the costs of the proceedings, including the charge for transporting the prisoner, to be paid as shall seem right." W. Va. Code Ann. § 53-4-7 (West). The West Virginia Code governing habeas corpus proceedings also provides that at the conclusion of the habeas matter, "[i]n the event a petitioner who is proceeding in forma pauperis *does not substantially prevail*, all such costs, expenses and fees shall be and constitute a judgment of the court against the petitioner to be recovered as any other judgment for costs." W. Va. Code Ann. § 53-4A-4(b) (West) *(emphasis added)*.

The Court has carefully considered Petitioner's twenty-nine (29) alleged grounds for relief and has given Petitioner the benefit of every reasonable doubt in considering those grounds. Yet the Court has concluded overwhelmingly that the Petitioner is entitled to no relief because Petitioner's claims are unsupported by the evidence adduced at the omnibus evidentiary hearings, the record in this matter, and the law. The Court has found that many of Petitioner's contentions are wholly unfounded and have no basis in law or fact. Indeed, in some instances, the Court sincerely questions the veracity of Petitioner's allegations and testimony presented in support thereof. In any event, the Petitioner is not entitled to any of the relief sought in Petitioner's *Petition Under W.Va. Code § 53-4A-1 for a Writ of Habeas Corpus*.

Based upon the foregoing, the Court finds that Petitioner has failed to substantially prevail on any of his alleged claims for relief. The Court further concludes that it is both

-93-

appropriate and warranted for the Petitioner to be assessed all related costs, expenses and fees associated with the prosecution of this habeas proceeding in Fayette County Circuit Court civil case number 12-C-283.

## FINAL RULING AND JUDGMENT

**THEREFORE,** in consideration of all of the above, the Court is of the opinion to, and hereby does, **DENY** the relief sought by the Petitioner in his *Petition Under W.Va. Code §53-4A-1 for a Writ of Habeas Corpus* and **DISMISSES** this matter, with prejudice.

As the Petitioner did not substantially prevail in this matter, the Court further **ORDERS** that the Petitioner *shall be assessed all costs, expenses and fees* associated with the prosecution of this matter and that all such costs, expenses and fees "shall constitute a **JUDGMENT OF THE COURT** against the Petitioner to be recovered as any other judgment for costs." W.Va. Code § 53-4A-4(b) **(EMPHASIS ADDED)**.

This ninety-four (94) page *Order Denying And Dismissing Petition* is a **FINAL ORDER.** The Clerk is directed to remove this matter from the Court's active docket.

The Clerk is further directed to send an attested copy of this *Order Denying And Dismissing Petition* to: **Henry C. Jenkins, Inmate # 51235,** Mount Olive Correctional Complex, One Mountainside Way, Mount Olive, WV 25185; **Thomas K. Fast, Esq.,** P.O. Box 420, 201 North Court Street, Fayetteville, WV 25840; **David Ballard, Warden,** Mount Olive Correctional Complex, One Mountainside Way, Mount Olive, WV 25185; and **Brian D. Parsons, Assistant Prosecuting Attorney,** 108 East Maple Avenue, Fayetteville, WV 25840.

**ENTERED** this 19th day of February 2015.

PAUL M. BLAKE, JR.
JUDGE

Judge Paul M. Blake, Jr.

-94-

TRUE COPY of an order entered
February 19, 2015
Teste: Danielle. Wright
Circuit Clerk Fayette County, WV